Richard G. ELLIS, Plaintiff–Appellant,

v.

MOBIL OIL, a New York corporation; Union Oil Company of California, Defendants–Appellees.

Richard G. Ellis, Plaintiff–Appellee,

v.

Mobil Oil, a New York corporation; Union Oil Company of California, Defendants–Appellants.

Nos. 91–15073, 91–15244.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted April 15, 1992.

Decided July 7, 1992.

---

Ronald W. Meyer, Phoenix, Ariz., for plaintiff-appellant-cross-appellee.

N. Warner Lee, Ryley, Carlock & Applewhite, Phoenix, Ariz., for defendants-appellees-cross-appellants.

Before: GOODWIN, SCHROEDER and LEAVY, Circuit Judges.

GOODWIN, Circuit Judge:

Richard Ellis operated as lessee from Mobil a gasoline service station in Willcox, Arizona. Mobil informed Ellis that his lease and franchise would not be renewed. Ellis sued under the Petroleum Marketing Practices Act ("PMPA"), *see* 15 U.S.C. §§ 2801–2806, and appeals a summary judgment in favor of Mobil.

Mobil had negotiated with Union Oil Company of California ("Unocal") for the exchange of six Unocal stations in Florida for seven of Mobil's California stations plus the Arizona station operated by Ellis. Ellis sued both oil companies, claiming that they had infringed his franchisee rights under the PMPA.

The parties agreed that Mobil had a good faith business reason for terminating his franchise and that Ellis received statutory notice. The only substantial issue on appeal is whether Mobil complied with 15 U.S.C. § 2802(b)(3)(D)(iii) by offering to sell the station to Ellis for $581,000, the value Unocal internally placed on the Arizona station for purposes of the exchange agreement.[1]

Section 2802(b)(3)(D)(iii) requires:

in the case of leased marketing premises such franchisor, during the 90–day period after notification was given pursuant to section 2804 of this title, either—

(I) [to make] a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or

(II) if applicable, [to offer] the franchisee a right of first refusal of at least 45–days duration of an offer, made by another, to purchase such franchisor's interest in such premises.

15 U.S.C. § 2802(b)(3)(D)(iii).

Before granting Mobil's motion for summary judgment, the court earlier had ruled that the requirement of subparagraph (II) of the above statute was not applicable because the terms of the exchange agreement between the two oil companies made it impractical, if not impossible, for Ellis to exercise a right of first refusal. While Mobil disagreed and saved a protective

---

1. Ellis made other claims in the trial court but our disposition of the appeal makes it unnecessary to consider them.

cross-appeal from the ruling, the decision was correct.

█ When a third party's offer is in the form of a single transaction for cash, the court can justifiably infer that the amount of an arms' length offer represents the value of the station. On such facts, all a franchisee is entitled to is the right of first refusal. *See Ballis v. Mobil Oil Corp.*, 622 F.Supp. 473, 475 (N.D.Ill.1985). With an exchange agreement, one can infer from the fact that a transaction takes place that the exchanged items are of equal value, but the monetary value of the exchanged items is not necessarily apparent from the face of the transaction. If the exchange involves multiple properties, as in the present case, a stranger to the exchange would not necessarily know either the value of the entire package, or the value of any one of the independent components.

█ Mobil argues that the court should accept the internal valuation of $581,000 placed on the Willcox station by Unocal as the third party's offer and make this value the foundation of the franchisee's right of first refusal. The internal valuation, however, cannot be accepted as conclusive.

Mobil leased the land on which three of the exchanged stations were located. Prior to reaching agreement, Unocal obtained appraisals which collectively valued the three leased stations at $419,230. Mobil estimated the properties to be worth $400,000 and carried a book value for the stations of $155,968. For the purposes of the exchange agreement, however, Unocal valued each of the leased exchange stations at

zero, claiming that they had no economic worth.

Unocal now goes one step further, arguing that the leased stations were, in fact, a liability. This contention is unpersuasive. The statement contradicts both Mobil's and Unocal's appraised values of the stations. It is also contrary to Unocal's trial testimony in which a witness stated, not surprisingly, that Mobil would not be willing simply to give the stations away. Moreover, if the stations were in fact a liability, as old stations for environmental reasons sometimes prove to be, then the exchange agreement should have assigned them negative values requiring Mobil to give up additional concessions to make the package acceptable to Unocal.

The undervaluation of the leased stations in the exchange agreement is significant. Mobil and Unocal agreed to a total value of the exchange package. The internal valuations assigned numbers to the component parts that would sum to the agreed amount. The undervaluation of any constituent piece automatically inflates the "value" of the remaining parts. Valuing three stations potentially worth $400,000 at zero significantly inflates the internal valuation of the Willcox station.[2]

Because the right of first refusal under subparagraph (II) was not applicable, Mobil was obligated to extend Ellis a bona fide offer under subparagraph (I). The district court granted Mobil's motion on the theory that Ellis had failed to introduce evidence of the value of the station as a going concern.

---

**2.** Mobil and Unocal defend the internal valuation, arguing that each party was obligated to pay the allocated price if they were unable to deliver any of the stations under the exchange agreement. In fact, one of the Unocal franchisees in Florida exercised its right of first refusal and paid the exchange agreement value—a value established by Mobil, not Unocal, and a value unaffected by the undervaluation of the leased stations. Unocal, in turn, paid this sum to Mobil.

While this aspect of the agreement increases the credibility of the internal valuations, it does not necessarily support the conclusion that the allocated values reflect the market values of the properties. First, Unocal suffered no out-of-pocket cost when it failed to deliver the station.

Second, given the package nature of the arrangement, both parties would be willing to absorb a "penalty" payment equal to their subjective valuations of the worth of the entire package. A party may rationally be willing to suffer a loss on part of a deal if the net sum is still positive. Finally, the appropriate figure to examine is not the final $581,000 that would actually have to be paid for failure to deliver one of the stations, but rather, the expected value of that sum, ex ante, at the time of signing the agreement. The expected value would discount the final figure by the probability the parties assigned to the occurrence of not being able to deliver the station as part of the exchange agreement.

█ Under the PMPA, the franchisor has an affirmative obligation to come forward with a bona fide offer. The district court erred in concluding that the franchisee had the sole burden of establishing the fair market value of the station. The court should have made specific findings as to the objective reasonableness of the franchisor's offer. *See Slatky v. Amoco Oil Co.*, 830 F.2d 476, 485–86 (3rd Cir.1987).

> The district court held that
>
> [t]he value of a fully operative leased station necessarily includes the value of the business itself, as a going concern, the goodwill of the business, inventory and value for the sales of the petroleum products or accessories. Plaintiff presented no evidence as to the value of the fully operative leased station, but only as to the actual real estate value of the property.

The district court assumed a generalization that Mobil urged: that a bona fide offer incorporates the value of the station as a going concern, including the value of future sales and the goodwill of the business. On appeal, Mobil has cited, and we have found, no case that specifically supports this proposition.

Mobil and Unocal place great reliance on a line that appears in both *Gooley v. Mobil Oil Corp.*, 678 F.Supp. 939, 941 (D.Mass. 1987), *aff'd*, 851 F.2d 513 (1st Cir.1988), and *Tobias v. Shell Oil Co.*, 782 F.2d 1172, 1174 (4th Cir.1986), stating that a bona fide offer " 'must meet or very nearly approach' the fair market value of the fully operative leased station." (quoting *Brownstein v. Arco Petroleum Products Co.*, 604 F.Supp. 312, 315 (E.D.Pa.1985)). Neither case, however, discusses whether a bona fide offer under the PMPA consists of the ap-

praised value of the land, improvements and equipment, or the value of the station as a going concern. *Gooley* examines the ramifications of Mobil selling a station that was environmentally contaminated, making it difficult for the franchisee to obtain financing. Similarly, *Tobias* addresses Shell's policy of not including in its sales offer old storage tanks that posed a potential threat to the environment.

Moreover, *Gooley* and *Tobias* speak of a "fully operative" and not a "fully operating" station. For the purposes of valuation, the difference is important. The requirement that the station be fully operative is consistent with a number of PMPA cases that hold that the franchisor cannot impose restrictive covenants, *see ERA Enterprises, Inc. v. Gulf Oil Corp.*, 506 So.2d 160, 165 (La.App.1987), or exclude from their offer the sale of pumps, dispensers, storage tanks, piping or other equipment necessary for the continued operation of a service station, *see Roberts v. Amoco Oil Co.*, 740 F.2d 602, 603 (8th Cir.1984). The reasoning behind these cases is that the PMPA entitles franchisees to be able to continue operating their facility as a service station if they exercise their right to buy.[3] Nothing in these cases supports the defendants' proposition that a bona fide offer values the station as a going concern which includes the goodwill of the business or the value of future sales.[4]

█ It is settled law that a bona fide offer under the PMPA is measured by an objective market standard. To be objectively reasonable, an offer must "approach[ ] fair market value." *Slatky*, 830 F.2d at 485. *See also LCA Corp.*, 916 F.2d at 437; *Sandlin v. Texaco Refining and*

---

3. The environmental exception for leaking storage tanks noted by the Fourth Circuit in *Tobias*, 782 F.2d at 1174, and by the Eighth Circuit in *LCA Corp. v. Shell Oil Co.*, 916 F.2d 434, 436 (8th Cir.1990), is not inconsistent with this analysis.

4. Equally unpersuasive is the defendants' reliance on language from *LCA Corp.* holding that the district court could rely upon an alternative value approach in estimating the fair market value of the station. "Under this approach, [the appraiser] determined the annual net revenue from LCA's operations and deducted from that

amount an annual return factor based on the investment made to purchase the location and to purchase and install new gasoline station equipment and a canopy." 916 F.2d at 439. There are many acceptable ways to appraise property. Moreover, the passage bases its estimation of value on the franchisee's, not the franchisor's, operation and the calculation is based upon net revenue which appropriately deducts costs such as the franchise license from the value of the property.

*Marketing, Inc.*, 900 F.2d 1479, 1481 (10th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 252, 112 L.Ed.2d 210 (1990); *Brownstein,* 604 F.Supp. at 315. "[T]he overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship." *Slatky,* 830 F.2d at 484. When a franchisor decides for legitimate business reasons not to renew a franchise relationship, the franchisor must give the franchisee a bona fide offer to purchase the station. The offer to buy at fair market value serves as a second, and distinct, layer of protection, assuring the franchisee an opportunity to continue to earn a livelihood from the property while permitting the distributor to recover the fair market value of the property sold and to end the franchise relationship. *Id.*

The facts of each case will set the terms of what constitutes a bona fide offer. The record demonstrates that Ellis is entitled to a bona fide offer to buy land, improvements and equipment. The value of that offer should reflect what a willing purchaser would pay for the fee title of the land, the improvements and the equipment of a terminated franchise. A bona fide offer in this case would not include the value of the franchisee's own goodwill or Mobil's franchise value of the station. Such values as Mobil's accumulated advertising and trademark recognition are not being offered for sale and, therefore, need not be included in the franchisee's purchase price under the PMPA when the franchise is being terminated.

The district court's grant of partial summary judgment as challenged by the cross-appeal is AFFIRMED and the district court's dismissal of Ellis' claim is REVERSED. The case is REMANDED for further proceedings to determine whether the offer made by Mobil was bona fide, and to provide such further relief as may be required by the statute.