Marwan Ahmed HARARA, Plaintiff(s),

v.

CONOCOPHILLIPS COMPANY,
et al., Defendant(s).

No. C04–0515 BZ.

United States District Court,
N.D. California.

April 29, 2005.

Marwan Ahmed Harara, pro se.

Adam Friedenberg, Glynn & Finley, LLP, for defendant ConocoPhillips Company.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS

ZIMMERMAN, United States Magistrate Judge.

On September 23, 2004, I granted in part and denied in part defendant's motion to dismiss plaintiff's second amended complaint ("SAC") against defendant Conoco-Phillips Company ("Conoco") and dismissed plaintiff's claims against Dean Masterton, a Conoco Account Representative. Now before me are the parties' cross motions for summary judgment with respect to plaintiff's remaining claims against Conoco. For the following reasons, plaintiff's motion is denied and defendant's motion is granted.[1]

Plaintiff purchased the goodwill and leasehold of the 76–branded franchise gasoline retail station in Oakland, California (the "Station") from Tosco Marketing Company ("Tosco"), predecessor in interest to Conoco, in February 1999. SAC, ¶¶ 1, 2, 17. He qualified as a dealer and franchisee and began operating the Station with his brother, Murad Harara. In late 1999, plaintiff made improvements to the Station, including remodeling the snack shop and restroom. See Decl. of Marwan A. Harara in Supp. of his Mot. for Summ. J. ("Harara Decl."), Ex. C at 83–94. Tosco approved the improvements in advance, based on blueprints submitted by plaintiff, on the condition that the improvements conform to specifications set forth in its Snack Shop Improvement Manual.[2] Id. at 88–89, 95, Ex. E–10.

On January 16, 2001, plaintiff renewed the franchise for a three-year period pursuant to a Dealer Station Lease and Motor Fuel Supply Agreement (the "Franchise Agreement") that expired on April 30, 2004. Decl. of Dean Masterton in Supp. of Conoco's Mot. for Summ. J. or, in the Alternative, Summ. Adjudication as to Pl.'s Claims for Relief ("Masterton Decl."), Ex. A. In June or July 2002, defendant placed plaintiff on "Cash in Advance" status, which required him to prepay for all gasoline deliveries.[3] Harara Decl. ¶¶ 15–16,

---

1. This order relies on evidence admitted in accordance with the ruling on defendant's evidentiary objections, which will be issued separately.

2. The policy at the time was that the dealer would bear the cost of improvements. Harara Decl., Ex. C at 91. Pursuant to the "snack shop rental waiver," however, the franchisor would reimburse the dealer by waiving any increase in rent for the snack shop, for a period of up to five years. Id. at 91–92. Once the amount of waived rent equaled the total cost of improvements, the franchisor would then adjust the rent to reflect the increased square footage of the snack shop. Id. In plaintiff's case, the improvements would have increased plaintiff's rent

from approximately $250 to $500 per month. Id. Under the policy, plaintiff's rent remained at $250 following the improvements. Id. at 92–93.

3. Defendant originally extended plaintiff credit privileges that allowed him to order gasoline without paying in advance for the delivery. Curtis Decl. ¶ 3. Pursuant to this arrangement, defendant's Credit Department would authorize a delivery, and then draw funds via electronic fund transfers to pay for the delivery. Id. Defendant's policy was to rescind a dealer's credit privileges if three transfers were returned for insufficient funds during a 12–month period. Id. at ¶ 4. As of June 2002, plaintiff had more than three

Ex. B; Decl. of Paul Curtis in Supp. of Conoco's Mot. for Summ. J. or, in the Alternative, Summ. Adjudication as to Pl.'s Claims for Relief ("Curtis Decl.") ¶ 4.

In early 2003, following the merger of Conoco and Philips Petroleum Corporation, defendant decided to divest itself of approximately 100 petroleum service stations in California. Decl. of Philip Bonina in Supp. of Conoco's Mot. for Summ. J. or, in the Alternative, Summ. Adjudication as to Pl.'s Claims for Relief ("Bonina Decl.") ¶ 3. Plaintiff's station was among those identified for sale, and on April 2, 2003, defendant sent him a Notice of Nonrenewal. Id. The notice advised plaintiff that defendant would not renew the Franchise Agreement upon its expiration on April 30, 2004, and stated, "The reason for this nonrenewal is CONOCOPHILLIPS's determination made in good faith and in the normal course of business to sell CONOCOPHILLIPS's interest in the marketing premises." Id., Ex. A. Defendant also sent plaintiff a letter, dated April 2, 2003, that stated, "In accordance with the provisions of the Petroleum Marketing Practices Act, [Conoco] offers to sell the Marketing Premises to you pursuant to the terms set forth in the enclosed Real Estate Sales Contract." Id. at ¶ 4, Ex. A. The Real Estate Sales Contract ("Sales Contract") attached to the letter contained the relevant terms of defendant's offer to sell the premises to plaintiff for $1,120,000. Id. According to defendant, the purchase price was based on a third-party appraisal of the Station by Valuation Research that reflected a January 25, 2003 valuation date. Id. at ¶ 4, Ex. C. On June 6, 2003, following discussions with Richard Mathews, Conoco's Northern California Real Estate Manager, plaintiff accepted defendant's offer. Harara Decl.

¶ 3, Ex. U; Mathews Decl. ¶¶ 1, 3, Ex. A. While the Sales Contract specified a closing date of September 15, 2003, defendant extended the deadline at plaintiff's request on at least four occasions, and agreed to a final closing date of December 19, 2003. Decl. of Richard Mathews in Supp. of Conoco's Mot. for Summ. J. or, in the Alternative, Summ. Adjudication as to Pl.'s Claims for Relief ("Mathews Decl.") ¶ 6. On November 12, 2003, plaintiff's lender responded to his original loan application for $1,120,000 and requested that he reduce his loan application by $300,000. Harara Decl. ¶ 7, Ex. D. Plaintiff subsequently amended his loan application by reducing the amount by $300,000. Id. ¶ 8, Ex. D.

Both parties also contacted third parties regarding the sale of the Station. In November 2003, defendant secured from Khalid and Romana Usman an offer to purchase the property for $1,120,000. Bonina Decl., Ex. D. In December 2003, plaintiff entered into two separate form contracts with Wurn Waa Phan to purchase the Station, "including equipment, fixtures, goodwill ... inventory ... and improvements," from plaintiff. Id. ¶ 9; Exs. F, G. One contract was for $1,120,000, and was conditioned on Conoco transferring or assigning the Sales Contract. Id., Ex. G. The other contract was for $180,000. Id., Ex. F.

On January 6, 2004, defendant delivered gasoline to plaintiff on credit, pursuant to a one-time exception authorized by Conoco's Credit Department. Curtis Decl. ¶ 6. When plaintiff failed to pay for the shipment, Conoco placed him on a "credit hold" that required him to pay all outstanding amounts on his account prior to any further gasoline deliveries. Id. Plain-

transfers returned during the preceding 12 months, and defendant placed him on "Cash In Advance" status. Id.

tiff subsequently requested delivery of gasoline. Harara Decl. ¶ 13, Ex. P. Conoco did not respond. *Id.* at ¶ 13. In January or February 2004, plaintiff ran out of 89 and 91 octane gasoline. *Id.;* Decl. of David Vann in Supp. of Conoco's Mot. for Summ. J. or, in the Alternative, Summ. Adjudication as to Pl.'s Claims for Relief ("Vann Decl.") ¶ 2; Masterton Decl. ¶¶ 12–13.

Plaintiff did not close the escrow with Conoco on schedule, and on January 16, 2004, Conoco instructed the escrow agent to cancel escrow. Mathews Decl. ¶ 6; Harara Decl., Ex. E–6. Two days later, plaintiff sent Mathews a letter requesting consent to assign the Sales Contract to a third party purchaser. Harara Decl., Ex. E–8. The following day, Mathews sent plaintiff an email denying consent, and informing plaintiff that Conoco had cancelled escrow. *Id.,* Ex. E–6. On January 20, 2004, the escrow company contacted plaintiff and requested that he execute a release agreement so that it could return his $5,000 deposit. *Id.,* Ex. N. Two days later, Khalid and Romana Usman signed a contract to purchase the Station. The contract was effective March 4, 2004 and would have closed about 5 months later. Bonina Decl., Ex. D. On January 26, 2004, Mathews sent plaintiff a notice informing him that unless closing occurred within ten days, the Sales Contract would be null and void. Harara Decl., Ex. E–2. Plaintiff sent Mathews a letter rejecting the notice, and on February 6, 2004, plaintiff filed this lawsuit against defendant. *Id.,* Ex. O.

On February 11, 2004, Conoco sent plaintiff a notice of default informing him that he was in violation of the Franchise Agreement by failing to maintain a complete inventory of motor fuel. *See* Masterton Decl., Ex. C. On February 20, 2004, Conoco served Harara with written notice of termination based on his failures to stock 76–branded motor fuel, to pay $13,163.18 in rent and other charges, and to take reasonable steps to control the operations of the station. Harara Decl., Ex. S; Masterton Decl. ¶ 14, Ex. D. Conoco eventually terminated the Franchise Agreement and plaintiff surrendered possession of the Station.

## I. *PMPA Claims*

In his first and second claims plaintiff contends that defendant's decision not to renew the franchise violated the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. § 2801, *et seq.* Plaintiff first argues that Conoco's decision not to renew the Franchise Agreement was not made in good faith in the normal course of business.[4] A franchisor may choose not to renew the franchise relationship where the determination is made in

---

4. Defendant erroneously argues that I need not reach plaintiff's challenges to its determination not to renew the franchise relationship because it later terminated the Franchise Agreement. The cases cited by defendant do not hold that the PMPA does not apply where a franchisor decides to terminate after having issued a notice of nonrenewal. *See Akky v. BP America,* 73 F.3d 974 (9th Cir.1996) (holding that plaintiff had no PMPA claim where defendant franchisor had rescinded its notices of termination and continued to operate under the franchise agreement); *Ajir v. Exxon Corp.,* 855 F.Supp. 294, 299 (N.D.Cal.1994) (holding that the requirement to make a bona fide offer to sell under the PMPA did not apply where defendant later offered to renew its franchise relationship with plaintiffs). Defendant neither rescinded its notice of termination, nor offered to renew its franchise relationship with plaintiff. Rather, it elected to terminate the franchise. Had plaintiff been able to close escrow, defendant's later termination of the Franchise Agreement either would not have occurred or would have been of little import, as either plaintiff or a third party purchaser would have owned a non-Conoco Station. Issues surrounding the propriety of defendant's PMPA offer were not mooted by the subsequent termination.

good faith and in the normal course of business. 15 U.S.C. § 2802(b)(3)(D). "The good faith requirement looks to whether the franchisor's actions are designed to conceal selective discrimination against individual franchises." *Unocal Corp. v. Kaabipour,* 177 F.3d 755, 767 (9th Cir.1999). The test for determining good faith is subjective, and the court should look to the franchisor's intent rather than the effect of the franchisor's actions. *Svela v. Union Oil Co.,* 807 F.2d 1494, 1501 (9th Cir.1987). "A franchisor meets the 'normal course of business' requirement if the determination was the result of the franchisors' normal decision making process." *BP West Coast Products LLC v. Greene,* 318 F.Supp.2d 987, 996 (E.D.Cal. 2004) (citing *Beck Oil Co. v. Texaco Ref. & Mktg., Inc.,* 25 F.3d 559, 562 (7th Cir. 1994)); *see also Sandlin v. Texaco Ref. and Mktg., Inc.,* 900 F.2d 1479, 1481 (10th Cir.1990).

■ Defendant has presented evidence that its decision to sell the Station was based on a determination by senior management, following the merger of Conoco and Phillips Petroleum Company, to divest a number of petroleum service station sites throughout the country. Bonina Decl. ¶ 1. Plaintiff's station was one of approximately 100 stations in California that defendant identified for divestment. *Id.* While this evidence establishes that defendant's divestment decision was made in good faith and in the normal course of business, it is less clear why defendant chose to divest plaintiff's station in particular. In making divestment decisions defendant considered a number of factors, including volume of gasoline sales, dealer rent structure, ground lease tenure, quality of underground storage tanks, and the location and demographics of the site. *See id.* at 104–105. Defendant appears to have decided to divest itself of plaintiff's Station based on a several of these factors, including a significant decline in the volume of plaintiff's gasoline sales, and the fact that the Station was located in an economically challenged neighborhood with a very high crime rate and drug and gang problems. *See* Harara Decl., Exs. E at 105–106, 110–11, 116–117, 121, E–14. As with other divestments, the decision appears to have been based in part on a recommendation from several departments within Conoco, including the Real Estate and Marketing Departments. *See* Harara Decl., Ex. E at 102–104, 106, 108, 120, E–14. Based on this evidence I find that defendant has demonstrated that its decision to divest itself of plaintiff's station was made in good faith and in the normal course of business. Plaintiff has not presented sufficient evidence to establish that the decision to divest the Station was a sham, pretextual, discriminatory or otherwise not made in good faith and in the normal course of business. *See Svela,* 807 F.2d at 1501; *Marks v. Shell Oil Co.,* 643 F.Supp. 1050, 1053, 1055 (E.D.Mich.1986), *vacated on other grounds,* 830 F.2d 68 (6th Cir.1987).

Plaintiff contends that the fact that income from gasoline sales at the Station were more than $100,000 per year demonstrates that defendant's decision was made in bad faith. Plaintiff has not established that defendant based its nonrenewal decision solely upon gasoline sales, however.[5]

5. Plaintiff's primary evidence is the deposition of Dean Masterton, in which he stated in response to plaintiff's question about whether Conoco had fixed divestment criteria, "There isn't any such criteria today. Unocal in the past had their own criteria before Conoco—before Tosco purchased their assets. I've heard varying reports from $75,000 a year income to the company to a hundred thousand dollars a year was like the minimum. Anything below that consistently, not just for one year, but consistently would be targeted generally as a divestment. But again, that's not the only criteria." Harara Decl., Ex. E at 107:16–24.

Rather, the evidence establishes that defendant's decision not to renew the franchise was part of a general plan to divest itself of a number of stations, and that profits were among the many factors defendant considered. *See* Bonina Decl. ¶ 2; Harara Decl., Exs. E at 103–107; 116–19, E–14.

Plaintiff also argues that Masterton's statement in November 2002 that plaintiff should sell the Station establishes that the nonrenewal decision was made in bad faith. *See* Harara Decl., Ex. C at 53:19–54:19. The statement, made by Masterton in the context of a discussion about plaintiff's credit, merely establishes that because the Station's profitability was declining, Masterton's opinion was that plaintiff should sell the Station rather than seek to have his credit reinstated. *See id.* Masterton's statement, "you need act quickly because the operation of the station was as such that I had no choice but to non-renew your lease," is insufficient in and of itself to create a genuine issue of material fact regarding whether defendant decided not to renew in good faith. *See Id.* There is no evidence that Masterton was directly involved in the senior management divestment decision and Masterton testified he was not. *Id.* at 51.

Plaintiff's general allegations, unsupported by the record, are likewise insufficient to create a genuine issue of material

fact as to whether defendant's decision was made in good faith and in the normal course of business. *See* Fed.R.Civ.P. 56(e); *Rand v. Rowland,* 154 F.3d 952, 963 (9th Cir.1998). While plaintiff generally alleges that defendant continued to deny him credit privileges and access to financial information, he does not explain how these actions relate to defendant's decision not to renew the franchise. Plaintiff also generally claims that defendant never intended to perform under the Sales Contract, but he has provided no credible evidence to support this claim.[6]

The evidence presented establishes that defendant decided not to renew the franchise in good faith and in the normal course of business. A reasonable trier of fact could not conclude otherwise, and Conoco is therefore entitled to judgment as a matter of law. *See Unified Dealer Group v. Tosco Corp.,* 16 F.Supp.2d 1137, 1142 (N.D.Cal.1998) (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

■ Plaintiff next argues that defendant's offer to sell the station was not bona fide. In particular, plaintiff contends that both the provision in the Sales Contract prohibiting assignment and defendant's refusal to consent to assignment of the Sales Contract violated defendant's duty to make a bona fide offer to sell the Station.[7] *See*

---

**6.** In his February 9, 2005 response to defendant's interrogatories, plaintiff represented that he was "not aware of a claim that the OFFER was not made in good faith and in the normal course of business." Rep. Decl. of Adam Friedenberg in Supp. of Conoco's Mot. for Summ. J. or, in the Alternative, Summ. Adjudication as to Pl.'s Claims for Relief ("Friedenberg Rep. Decl."), Ex. A. While plaintiff's sworn statement would normally be sufficient to bar this claim, defendant waited until its reply to submit this evidence. Plaintiff has therefore had no opportunity to respond.

**7.** Section 10.3 of the Sales Contract provided:

> NO ASSIGNMENT. The provisions of this Contract and the offer to sell the Property shall be personal to Buyer, and may not be assigned by Buyer, except however, that Buyer shall have the right to assign its right, title and interest under this Contract, provided that the Buyer is not released from its obligations hereunder and the Contract is assigned to a corporation, partnership or limited liability company of which Buyer is the managing partner or managing member or in which the Buyer or any of its principals holds an interest.
>
> Mathews Decl., Ex. A.

15 U.S.C. § 2802(b)(3)(D)(iii)(I). While plaintiff's argument is not entirely clear, he appears to contend that the nonassignment clause constitutes an unreasonable restraint on alienation in violation of state law because it prevented him from assigning defendant's offer to a willing third-party buyer. *See* Cal. Civ.Code § 711. Assuming section 711 is not preempted by the PMPA, it is inapplicable to the contract at issue because the nonassignment clause only prevented plaintiff from assigning defendant's offer to sell the Station. It did not prevent him from assigning or otherwise transferring the remaining franchise term or transferring the Station to a third party once he had purchased the Station.

■ To the extent that plaintiff argues that the PMPA generally prohibits non-assignment clauses, his argument is also unavailing. Plaintiff has presented no authority to establish that in order to be bona fide, an offer made under section 2802(b)(3)(D)(iii)(I) must be freely assignable.

Finally, the cases cited by plaintiff are inapposite. In *Prestin v. Mobil Oil Corp.*, 741 F.2d 268 (9th Cir.1984), the Ninth Circuit, applying California law, held that where a contract prohibits assignment of a lease without the written consent of the landlord, the decision not to consent must be made in good faith. *Id.* While the California Supreme Court adopted the holding of *Prestin* in *Kendall v. Ernest Pestana, Inc.*, 40 Cal.3d 488, 495, 220 Cal. Rptr. 818, 709 P.2d 837 (1985), the California Legislature has since expressly limited the holding in that case. *See* Cal. Civ. Code § 1995.230 ("A restriction on transfer of a tenant's interest in a lease may absolutely prohibit transfer."); Cal. Civ. Code § 1995.230, Law Revision Commission Comment (1989) ("Section 1995.230 settles the question raised in *Kendall v. Ernest Pestana, Inc.*, of the validity of a clause absolutely prohibiting assignment or sublease. A lease term actually prohibiting transfer of the tenant's interest is not invalid as a restraint on alienation."). Further, both *Prestin* and *Kendall* involved an assignment of the remaining term in the lease. *See Prestin*, 741 F.2d at 269; *Kendall*, 40 Cal.3d at 492, 220 Cal.Rptr. 818, 709 P.2d 837. Plaintiff has presented no evidence that he attempted to assign the remaining term in Franchise Agreement to a third party. Unlike the cases cited by plaintiff, the non-assignment clause here expressly prohibited assignment, not assignment without defendant's consent. *See Prestin*, 741 F.2d at 269 n. 1; *Kendall*, 40 Cal.3d at 494 n. 5, 220 Cal. Rptr. 818, 709 P.2d 837; Mathews Decl., Ex. A. Plaintiff has therefore not demonstrated that either the non-assignment clause in the Sales Contract or defendant's decision not to consent to assignment of the Sales Contract rendered the offer not bona fide.[8]

■ Finally, plaintiff contends that defendant's offer was not bona fide because it was above fair market value. "It is settled law that a bona fide offer under the PMPA is measured by an objective market standard. To be objectively reasonable,

---

8. Plaintiff's argument that defendant anticipatorily breached the Real Estate Sales Contract by offering to sell the Station to the Usmans prior to closing, thus rendering the offer not bona fide is also unavailing. The PMPA does not prohibit a franchisor from marketing the premises; it only requires that the franchisor first make a bona fide offer to sell the premises to the franchisee. *See* 15 U.S.C. § 2802(b)(3)(D)(iii)(I). Here, the Usmans offered to purchase the Station in November 2003, defendant accepted the offer on February 11, 2004, and the contract became effective on March 4, 2004. *See* Mathews Decl. ¶ 8; Bonina Decl., Ex. D. The contract with the Usmans was not effective until well after the close of escrow, and therefore did not violate the PMPA.

an offer must approach fair market value." *Ellis v. Mobil Oil,* 969 F.2d 784, 787–88 (9th Cir.1992) (citing *Slatky v. Amoco Oil,* 830 F.2d 476, 485 (3d Cir.1986)). "The facts of each case will set the terms of what constitutes a bona fide offer." *Id.* "When a third party's offer is in the form of a single transaction for cash, the court can justifiably infer that the amount of an arms' length offer represents the value of the station." *Ellis,* 969 F.2d at 786; *see also BP West Coast Products,* 318 F.Supp.2d at 1000; *Lee v. Exxon Co., U.S.A.,* 867 F.Supp. 365, 368 (D.S.C.1994); *Ballis v. Mobil Oil Corp.,* 622 F.Supp. 473, 475 (N.D.Ill.1985). "Congress' use of the term 'bona fide' rather than 'fair market value' in the statute indicates a recognition that the word 'value' almost always involves a conjecture, a guess, a prediction, a prophesy. [T]here is no universally infallible index of fair market value." *Magerian v. Exxon Corp.,* 1996 WL 119481 at *5 (N.D.Cal.1996), *affirmed,* 124 F.3d 212, 1997 WL 525273 (9th Cir.1997) (citing *Slatky,* 830 F.2d at 485) (internal quotation marks omitted).

■ Defendant offered to sell the Station to plaintiff for $1,120,000, based on a third-party appraisal by Valuation Research. Bonina Decl. ¶ 4, Exs. A, C. When plaintiff accepted on June 6, 2003, he did not contend that the offer was not bona fide or condition acceptance on a lower price. Harara Decl., Ex. U. A third party offered and eventually purchased the property for $1,120,000. *See* Mathews Decl. ¶ 8; Bonina Decl. ¶¶ 4, 7, Ex. D. That a third party offered and eventually purchased the property for the same price offered to plaintiff strongly indicates that

defendant's offer was bona fide. Even plaintiff's own third party purchaser, Phan, offered a total of $1,300,000 for the Station. *See* Harara Decl., Exs. F, G.

Plaintiff has not offered evidence from an independent appraiser that the $1,120,000 offer did not approach fair market value. Instead, he makes much of the fact that he learned during discovery that defendant obtained two valuations for different amounts from Valuation Research, one appraising the property at $1,120,000 and the other at $1,040,000.[9] *See* Harara Decl., Exs. E–18, E–19. Plaintiff does not challenge the specific facts used by Valuation Research in their valuation, nor does he contend that the company used improper methods or procedures in determining the market value of the Station. Rather, he argues that because defendant had two estimates, and chose the higher estimate, defendant's offer was per se not bona fide. In light of the fact that a third party paid $1,120,000 for the Station, and another party offered $1,300,000, that defendant chose the higher estimate is, standing alone, insufficient to demonstrate that the offer was not bona fide.

■ Plaintiff also contends that the offer was not bona fide because Mathews orally promised him that defendant would reduce the purchase price. *See* Harara Decl. ¶ 6. Assuming for purposes of these motions that Matthews orally agreed to reduce the purchase price by $75,000 and later reneged, that would not necessarily mean that defendant's offer was not bona fide for number of reasons. First, because the sales contract is fully integrated, any prior or contemporaneous oral representa-

9. According to defendant, despite the fact that the two valuations bear the same date, the lower valuation was actually prepared by Valuation Research and received by defendant two months after the date of the higher valuation, and approximately one month after de-

fendant offered to sell the Station to plaintiff. *See* Harara Decl., Ex. E at 164–65. Defendant also contends the second valuation was actually obtained as part of a survey to determine the rental value of its Stations. *See* Harara Decl., Ex. E at 164–65.

tion made by Matthews is inadmissible to vary the terms of the agreement. *See* Mathews Decl., Ex. A; Cal. Civ.Code § 1625; Cal Civ. P.Code § 1856; *Chevron U.S.A. Inc. v. El–Khoury*, 285 F.3d 1159, 1165 (9th Cir.2002). Any post-contract statements by Mathews were also ineffective to modify the Sales Contract, which contained a clause prohibiting oral modifications. *See* Mathews Decl., Ex. A; *Conley v. Matthes*, 56 Cal.App.4th 1453, 1465, 66 Cal.Rptr.2d 518 (1997); *Marani v. Jackson*, 183 Cal.App.3d 695, 705–706, 228 Cal.Rptr. 518 (1986). Moreover, Mathews' subjective intent is not relevant to whether the $1,120,000 offer was bona fide.[10] *See Ellis*, 969 F.2d at 787–88 (holding that the bona fide offer standard is objective, and measures whether the offer approached fair market value).

Second, this is not a case where Conoco can be said to have induced plaintiff to accept a higher offer by misrepresenting that it would reduce the price and then try to hold plaintiff to the higher offer. Not only did Conoco not try to force plaintiff to honor his acceptance, it even returned his security deposit. Finally, plaintiff does

not contend that he would have been able to purchase the station for $75,000 less than the agreed price, since his bank would only finance an $820,000 transaction. *See* Harara Decl., ¶ 7, Ex. D.

It is undisputed that defendant offered the Station to plaintiff for $1,120,000, based on the terms reflected in the Sales Contract. The only issue before me is whether this offer was bona fide under the PMPA. Defendant has demonstrated that its offer was objectively reasonable because it approached fair market value. *See id.* I find that because no genuine issue of material fact exists with respect to whether defendant's offer was bona fide, it is entitled to judgment as a matter of law. Plaintiff's motion for summary judgment on his first and second claims is **DENIED**, and defendant's motion for summary judgment is **GRANTED**.

 In his third claim, plaintiff contends that defendant constructively terminated the franchise.[11] It is entirely unclear under what law plaintiff is bringing this claim. He has provided no citation to legal authority, and does not otherwise

---

**10.** Plaintiff also claims that defendant's offer was not bona fide because defendant included the value of the improvements in the offer, but never reimbursed him for the improvements although Mathews represented it would do so. However, plaintiff does not dispute that Mathews told plaintiff that Conoco would "consider" reimbursing plaintiff for amounts spent on improvements; that Mathews did not have the authority to make a final determination on the matter; and that any reimbursement would have to be submitted to, and approved by, Conoco's Wholesale Operations Department; which never occurred. Harara Decl., Exs. E at 145–46, E–8, E–9, E–11–13, E–16, K, M; Mathews Decl. ¶¶ 4–5; Decl. of Douglas Bergman in Supp. of Conoco's Mot. for Summ. J. or, in the Alternative, Summ. Adjudication as to Pl.'s Claims for Relief ("Bergman Decl.") ¶¶ 3–5, Ex. A. Putting aside the issue of whether plaintiff may have been able to recover from defendant the value of such improvements had he brought

an appropriate claim not premised on a PMPA offer, whether defendant would reimburse plaintiff for any improvements is not relevant to whether defendant's offer approached fair market value. *See Ellis*, 969 F.2d at 787–88. The fair market value of the property is driven by the market; not by reference to any claims that may exist between a dealer and an oil company.

**11.** Specifically, plaintiff contends that defendant constructively terminated the franchise by: (1) canceling his credit privileges and putting him on "Cash In Advance" status; (2) withholding payment for credit card sales until his next purchase of gasoline; (3) making untimely and late deliveries of gasoline; (4) refusing to accept his orders for gasoline in January 2004; (5) denying him access to financial information via the internet; and (6) failing to construct certain improvements required by the City of Oakland.

explain his claim. To the extent that plaintiff intends to bring a claim under state law, it is pre-empted. *See* 15 U.S.C. § 2806(a). Assuming that a constructive termination claim is actionable under the PMPA, plaintiff has not submitted sufficient evidence to establish that defendant violated the Franchise Agreement or otherwise constructively terminated the franchise.[12] *See April Mktg. & Distrib. Corp. v. Diamond Shamrock Ref. & Mktg. Co.,* 103 F.3d 28, 30–31 (5th Cir.1997) (holding that a claim for constructive termination does not exist where the franchisor has acted within its rights under the franchise); *Fresher v. Shell Oil Co.,* 846 F.2d 45, 46–47 (9th Cir.1988) (holding that franchisees failed to state a claim where they had not alleged that defendant breached the franchise agreements). As a result, no genuine issues of material fact exist with respect to plaintiff's constructive termination claim.[13]

██ Plaintiff first contends that defendant constructively terminated the franchise by terminating his credit privileges and requiring him to prepay for gasoline. Section 16(a) of the Franchise Agreement provided that defendant "may change credit terms, including but not limited to, defer product shipments until payment is made, demand cash payment, demand payment in advance, nonrenew, or terminate" if plaintiff fails to fulfill terms of payment or if his financial condition deteriorates. *See* Masterton Decl., Ex. A, § 16. It is undisputed that defendant terminated plaintiff's credit privileges, pursuant to company policy, following the return of more than three of his Electronic Fund Transfers during the 12–month period preceding June 2002. *See supra* note 2. Plaintiff has failed to establish that the Franchise Agreement required defendant, under these circumstances, to continue delivering gasoline to plaintiff on credit.

Second, while plaintiff contends that defendant offset amounts due him from credit card sales against the cost of his next gasoline purchase, he has failed to establish that this violated the Franchise Agreement. Section 16(d) of the Franchise Agreement provided that defendant "may use, without prior notice or demand, any or all of DEALER's credit card receipts to setoff or satisfy all or any part of any indebtedness or obligation of the DEALER." Masterton Decl., Ex. A.

██ Third, plaintiff argues that defendant constructively terminated the franchise by making untimely and late deliveries of gasoline. Even if defendant's deliveries occurred two to three days following payment, as plaintiff claims, this does not give rise to a claim of constructive termination under the PMPA. The Franchise Agreement provided that defendant was not responsible for any delay in motor fuel deliveries due to defendant's inability to confirm plaintiff's funds, and plaintiff does not dispute that delivery delays were due in part to his credit status. Nor does plaintiff explain

---

**12.** The Ninth Circuit has not determined whether a claim for constructive termination exists under the PMPA, and I need not decide this issue here. *See Portland 76 Auto/Truck Plaza, Inc. v. Union Oil Co. of California,* 153 F.3d 938, 948 (9th Cir.1998) ("We assume for purposes of discussion, but do not decide, that constructive termination may give rise to a claim under the Act.") (citing *Little Oil Co., Inc. v. Atlantic Richfield Co.,* 852 F.2d 441, 444 n. 4 (9th Cir.1988)).

**13.** A PMPA franchise is composed of three elements: the contract to use the refiner's mark, the contract for the supply of motor fuel, and the lease of the service station premises. *Fresher,* 846 F.2d at 46–47. In this case, the terms embodying these three elements are reflected in the Franchise Agreement. *See* Masterton Decl., Ex. A.

why, knowing his credit status, he did not order early. *See* Masterton Decl. ¶ 10, Ex. A, § 12(b). The Franchise Agreement also limited defendant's liability for any delays in delivering gasoline. *See* Masterton Decl., Ex. A, § 12(b).

Fourth, plaintiff contends that defendant constructively terminated the franchise by refusing to accept his request for gasoline in January 2004. The Franchise Agreement provided that defendant could defer product shipments until plaintiff had fully paid his outstanding account balance. Masterton Decl., Ex. A, § 16(b). It is undisputed that plaintiff had an outstanding balance as of January 6, 2004, and plaintiff has not established that the Franchise Agreement required defendant to deliver gasoline under these circumstances. *See* Curtis Decl. ¶¶ 6–7.

Fifth, plaintiff argues that defendant constructively terminated the franchise by denying him access to financial information. Plaintiff has submitted no evidence to support this claim, nor has he established that the Franchise Agreement required defendant to provide such access. By contrast, defendant has demonstrated that plaintiff had internet access to his financial records. Curtis Decl. ¶ 9.

Finally, while plaintiff contends that defendant failed to construct improvements required by the City of Oakland to curb the spread of illegal activity at the Station, he has not established that either the City of Oakland or the Franchise Agreement required defendant to improve the Station. For the foregoing reasons, plaintiff's motion for summary judgment with respect to his third claim for relief is **DENIED**, and defendant's motion is **GRANTED**.

 Plaintiff's fourth claim alleges that defendant terminated him in retaliation for this lawsuit. The only evidence he offers to support this contention is the fact that the termination occurred shortly after the filing of the lawsuit. The mere fact that plaintiff is participating in a suit against Conoco does not give rise to a presumption of retaliatory intent on Conoco's part, especially given plaintiff's defaults which had occurred prior to filing suit. *See Magerian,* 1996 WL 119481 at *5. As a result, his motion for summary judgment with respect to his fourth claim for relief is **DENIED**, and defendant's motion is **GRANTED**.

, Plaintiff's fifth claim alleges that defendant's actual termination of the franchise in February 2004 violated the PMPA because it was not based on permissible grounds under section 2802(b)(2). Under section 2802(b)(2) a franchisor may terminate the franchise relationship where the franchisee fails "to comply with any provision of the franchise which provision is both reasonable and of material significance to the franchise relationship, if the franchisor first acquired actual or constructive knowledge of such failure." 15 U.S.C. § 2802(b)(2)(A).

In its notice, defendant specified three reasons for termination: (1) plaintiff's failure to stock 76–branded motor fuel, (2) plaintiff's failure to pay $13,163.18 in rent and other charges, and (3) plaintiff's failure to take reasonable steps to control the operations of the Station. Harara Decl., Ex. S; Masterton Decl. ¶ 14, Ex. D. It is difficult to imagine a contractual requirement more material to the franchise than requiring the franchisee to actually sell 76–branded gasoline. *See Magerian,* 1996 WL 119481 at *6. Defendant's decision to terminate on this basis was therefore reasonable. *See* 15 U.S.C. § 2802(b)(2)(A). Defendant was also justified in terminating the franchise based on defendant's failure to pay rent. *See Murphy Oil USA, Inc. v. Brooks Hauser,* 820 F.Supp. 437, 443 (D.Minn.1993) ("[T]here is no doubt that failure to make timely payments of all sums to which the franchisor is legally

entitled is grounds for termination under the PMPA."). Finally, while it is not entirely clear that plaintiff failed to make improvements required by the City of Oakland, or that this constituted a violation of the Franchise Agreement, the other two grounds alone are sufficient to justify defendant's termination.

■ Plaintiff also contends that defendant did not give sufficient notice prior to terminating the franchise. While the PMPA generally requires 90 days notice of termination, in certain circumstances notice less than 90 days is reasonable. *See* 15 U.S.C. § 2804(b)(1); *Murphy Oil,* 820 F.Supp. at 443 (14 days notice reasonable where plaintiff failed to pay $33,176.42 for gasoline purchases and rent); *Smoot v. Mobil Oil Corp.,* 722 F.Supp. 849, 855 (D.Mass.1989) (four weeks notice sufficient where plaintiff failed to stock gasoline); *Loomis v. Gulf Oil Corp.,* 567 F.Supp. 591, 597 (M.D.Fla.1983)(five days notice sufficient for failure to pay amounts due). Defendant has demonstrated that plaintiff failed to pay rent in January and February 2004 and that he failed to fully pay for a January 6, 2004 shipment of gasoline. Curtis Decl. ¶¶ 6–8. Plaintiff does not contend that he would have cured the deficiencies had he been given more time. I find that under the circumstances presented in this case, defendant was justified in terminating the franchise with ten days notice. Plaintiff's motion for summary judgment as to his actual termination claim is therefore **DENIED,** and defendant's motion is **GRANTED.**

## II. *ECOA Claim*

Plaintiff's sixth claim seeks relief pursuant to the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691 *et seq.,* based on defendant's termination of plaintiff's credit privileges in July 2002. *See* Harara Decl. ¶ 21, Ex. C at 47:17–23. In particular, plaintiff contends that defendant failed to provide him with a statement of reasons for the credit denial and failed to respond to his letter regarding a reinstatement of his credit privileges. *See* Harara Decl. ¶ 21. Plaintiff arguably abandoned this claim by stating in his deposition that he did not have the facts to establish a cause of action for violation of a federal credit statue, and that he was not currently claiming any violation of a federal credit statute by defendant. *See* Decl. of Adam Friedenberg in Supp. of Conoco's Mot. for Summ. J. or, in the Alternative, Summ. Adjudication as to Pl.'s Claims for Relief ("Friedenberg Decl."), Ex. A at 145–46.

■ Even if plaintiff had not abandoned this claim, defendant would still be entitled to summary judgment. Section 1691(d)(2) of the Act provided that "[e]ach applicant against whom adverse action is taken shall be entitled to a statement of reasons for such action from the creditor." 15 U.S.C. § 1691(d)(2). The term "adverse action" does not include "[a]ny action or forbearance relating to an account taken in connection with inactivity, default, or delinquency as to that account." 12 C.F.R. § 202.2(c)(2). Defendant contends, and plaintiff does not dispute, that the adverse action in this case was the credit denial, and that the denial was due to plaintiff's failure to make prompt payments for gasoline deliveries. *See* Masterton Decl., Ex. B; Friedenberg Decl., Ex. A at 62:17–63.8; Curtis Decl. ¶ 4. As the adverse action was based on plaintiff's default, section 1691(d)(2) does not provide plaintiff with a basis for a claim.

Plaintiff also contends that defendant violated the ECOA by failing to respond to his application for reinstatement of his credit privileges. Section 1691(d)(1) provides that "Within thirty days .... after receipt of an completed application for credit, a creditor shall notify the applicant of its action on the application." 15 U.S.C.

§ 1691(d)(1). Application "means an oral or written request for an extension of credit that is made in accordance with procedures used by a creditor for the type of credit requested." 12 C.F.R. § 202.2(f). Plaintiff's application was incomplete because it did not include all required documents, including his profit and loss statements and cash flow and balance sheets for the preceding year. Masterton Decl. ¶ 9; Harara Decl., Ex. C–3. Plaintiff's motion as to his sixth claim for relief is therefore **DENIED**, and defendant's motion is **GRANTED**.[14]

### III. *State Law Claims*

■ Under his eighth claim, plaintiff contends that defendant violated section 1787.2 of the California Civil Code by failing to provide the required notifications after his first termination of credit and not responding to his application for renewal of credit. Section 1787.2 requires a creditor to notify an applicant, within thirty days of receipt of a completed, written application for credit, of its action on the application. Cal. Civ.Code § 1787.2(a). "The term 'applicant' means a natural person who applies for credit primarily for personal, family or household purposes." Cal. Civ.Code § 1787.2(e)(1). Plaintiff does not dispute that he applied to defendant for credit solely related to his service station business. *See* Friedenberg Decl., Ex. A at 146:22–147:6, Ex. D at 5:13–19. Indeed, the only evidence he has presented is his application to defendant to reinstate his credit privileges so that he did not have to continue to prepay for gasoline. *See*

Harara Decl, Ex. C–3. While I have found no authoritative state law defining "primarily for personal, family or household purposes," whatever the phrase may mean, it does not apply to plaintiff, who applied to defendant for credit related solely to his service station business.[15] As plaintiff has provided no evidence that he applied for credit for primarily personal, family or household purposes, I find that no genuine issue of material fact exists with respect to plaintiff's eighth claim. Accordingly, plaintiff's motion for summary judgment on his eighth claim is **DENIED**, and defendant's motion is **GRANTED**.

■ With respect to his ninth claim, although plaintiff did not explicitly seek to assign the remaining term of his franchise, he contends that defendant's denial of consent to assignment of the Sales Contract constitutes an implicit denial of assignment of the Franchise Agreement in violation of section 21148 of the California Business and Professions Code. Under section 21148, a franchisor may not withhold its consent to the sale, transfer, or assignment of the franchise unless the franchisor demonstrates that one of the enumerated circumstances applies. Cal. Bus. & Prof. Code § 21148(a). Plaintiff has not presented any evidence that he requested to sell, transfer, or assign the remaining term of his franchise to Phan, or to any other third party. His motion for summary judgment as to his ninth claim is therefore **DENIED**, and defendant's motion is **GRANTED**.

---

**14.** In my September 15, 2004 Order, I dismissed plaintiff's seventh claim for relief with leave to amend. Plaintiff did not amend his claim.

**15.** In my September 15, 2004 Order I concluded that under the lenient standard of notice pleading plaintiff's allegations were broad enough that I could not conclude that he was

not an "applicant" under the section 1787.2. *See* September 22, 2004 Order. Plaintiff incorrectly interprets my statement that the Act "does not expressly limit its protections to only consumer credit," to mean that plaintiff would have a claim against defendant if he had applied for credit solely for business purposes. *See id.*

In his tenth claim for relief, plaintiff contends that defendant violated section 21140.2 of the California Business and Professions Code by requiring him to sell only 76–branded motor oil. Section 21140.2 provides, in relevant part, "it shall be illegal for any franchisor by any action to require a franchisee to purchase only ... motor oil ... sold by the franchisor. A franchised gasoline dealer may sell any ... motor oil ... as may be available to him or her for retail sale." Cal. Bus. & Prof.Code § 21140.2. It is undisputed that defendant did not require plaintiff to purchase or sell only 76–branded motor oil. *See* Harara Decl., Ex. A at 136:22–137:3. His motion with respect to his tenth claim is therefore **DENIED**, and defendant's motion is **GRANTED**.

Plaintiff's eleventh claim alleges that defendant breached the Franchise Agreement by terminating his credit privileges and denying him access to his financial records. Defendant complied with the terms of section 16 of the Franchise Agreement when it terminated plaintiff's credit privileges. *See supra* p. 19. Plaintiff has not demonstrated that the Franchise Agreement required defendant to provide access to his financial records, nor does he dispute that, as a service station operator, he had internet access to such information through defendant's website. Curtis Decl. ¶ 9. Plaintiff's motion for summary judgment on his eleventh claim is therefore **DENIED**, and defendant's motion is **GRANTED**.

■ With respect to his twelfth claim, plaintiff argues that defendant breached the Franchise Agreement by failing to make timely deliveries of gasoline. *See* Harara Decl., ¶¶ 14–16, Ex. A at 143:6–144:1. Section 12(b) of the Franchise Agreement provides that defendant "will fill orders with reasonable promptness, but

shall not be liable for loss or damage due to delays or failure in whole or in part to fill orders resulting from DEALER's banking arrangements" or defendant's ability to "confirm DEALER's funds." Masterton Decl., Ex. A. Plaintiff does not specify the particular dates on which defendant made late deliveries, nor does he dispute that the delays were due in part to his credit status.[16] *See* Masterton Decl. ¶ 10. In any event, the Franchise Agreement expressly limited defendant's liability for delivery delays. Masterton Decl., Ex. A, § 12(b) ("In no event shall [Conoco] be liable for loss of profits or special or consequential damages because of delay or failure to make deliveries."). Plaintiff has failed to establish that the defendant's late deliveries violated the Franchise Agreement. As no genuine issue of material of fact exists, plaintiff motion for summary judgment on his twelfth claim is **DENIED**, and defendant's motion is **GRANTED**.

Plaintiff has also failed to provide sufficient evidentiary support for his thirteenth claim for relief for breach of contract. Plaintiff erroneously contends that defendant breached the Franchise Agreement by withholding payment for credit card sales until his next purchase of gasoline and failing to reimburse him for these sales. Section 16(d) of the Franchise Agreement provided that defendant could setoff credit card receipts to satisfy past indebtedness. Masterton Decl., Ex. A. Section 17 provided that where plaintiff was past due on any payment, defendant may "first apply credit card invoices to the payment of the past due indebtedness." *Id.* Defendant has demonstrated that plaintiff received a gasoline delivery on January 6, 2004, which cost $14,310.82. Curtis Decl. ¶ 6. At the time, defendant owed plaintiff $5,449.23 for recent credit

---

**16.** Defendant's refusal to deliver gasoline in January 2004 was based on plaintiff's failure to pay for a prior shipment of gasoline. *See* Curtis Decl. ¶ 6.

card sales. *Id.* Subtracting these amounts, plaintiff still owes $8,861.23, which he has failed to pay.[17] *Id.* Plaintiff has not established that defendant currently owes him money for any outstanding credit card sales.

■ Plaintiff also contends that defendant failed to reimburse him for credit card sales that customers disputed or refused to pay. Plaintiff has presented four credit card receipts and a statement titled "invoice chargebacks" which states "customer denies participation" for each invoice. *See* Harara Decl., Ex. Y. These four receipts total $107.23. *Id.* Plaintiff has not demonstrated that defendant violated the Franchise Agreement by requiring plaintiff to bear the cost of these "invoice chargebacks," nor has he has established that defendant owes him any money for these disputed payments. In fact, the Franchise Agreement provided that under certain circumstances, defendant could charge back invoices to Harara, and apply credit card invoices to past due indebtedness. *See* Masterton Decl., Ex. A, § 17. Accordingly, I find that no genuine issue of material fact exists, and defendant is entitled to judgment as a matter of law. Plaintiff's motion for summary judgment on his thirteenth claim for relief is therefore **DENIED**, and defendant's motion is **GRANTED**.

In his fourteenth claim, plaintiff contends that defendant breached the Sales Contract by refusing to consent to assignment, offering the Station to the Usmans, and canceling escrow without granting ten days notice. These allegations merely restate plaintiff's prior claims. Plaintiff has presented no argument with respect to these claims and instead refers to the first portion of his motion. I have already found that no genuine issue of material fact exists as to these claims, and that defendant is entitled to judgment as a matter of law. For the reasons stated above, his motion with respect to these claims is also **DENIED**, and defendant's motion is **GRANTED**.[18]

In his twenty-first claim, plaintiff essentially incorporates his other claims and contends that they also constitute independent violations of section 17200 *et seq.* of the California Business and Professions Code. Plaintiff also contends that defendant violated section 31201 of the California Corporations Code by continuing to market the Station during the escrow period, and that this violates California Business and Professions Code § 17200 *et seq.* Section 31201 is only applicable to the sale of franchises, and plaintiff has provided no evidence that defendant offered to sell the franchise; it only sold the Usmans the property on which the station was located. *See* Cal. Corp.Code §§ 31002, 31201. To the extent that plaintiff relies on his other claims as an independent basis for relief under his twenty-first claim, I have granted defendant summary judgment on these claims.[19] Plaintiff has not established that defendant's actions otherwise constituted

---

17. While plaintiff contends that he had a $15,000 credit reserve as of March 1, 2001, defendant has shown that it applied $10,000 toward plaintiff's past unpaid debt on November 13, 2002, and the additional $5,000 toward plaintiff's $21,663.83 balance on September 9, 2004. *See* Rep. Decl. of Paul Curtis in Support of Conoco's Mot. for Summ. J. or, in the Alternative, Summ. Adjudication as to Pl.'s Claims for Relief, ¶ 2.

18. I previously dismissed plaintiff's fifteenth through twentieth claims for relief. *See* September 22, 2004 Order.

19. I have also dismissed plaintiff's twenty-first claim to the extent that it is preempted by the PMPA. *See* June 2, 2004 Order Granting in Part and Denying in Part Defendant's Motion to Dismiss at 12; September 22, 2004 Order at 7.

unlawful, unfair or fraudulent business practices or that defendant engaged in unfair, deceptive, untrue or misleading advertising in violation of California Business and Profession Code § 17200 *et seq.* Plaintiff's motion for summary judgment on his twenty-first claim is therefore **DENIED,** and defendant's motion is **GRANTED.**

IV. *Specific Performance and Declaratory Relief*

■ Defendant also seeks summary judgment on plaintiff's twenty-second claim for specific performance of the Sales Contract and his twenty-third claim for declaratory relief. As I have granted defendant's motion with respect each of plaintiff's claims, plaintiff is not entitled to specific performance of the Sales Contract.[20] Plaintiff's request for a declaratory judgment is similarly untenable because it relates solely to his PMPA claims, and I have already granted defendant summary judgment on these claims.[21] Defendant's motion for summary judgment on plaintiff's twenty-second and twenty-third claims is **GRANTED.**

Although plaintiff has raised many novel and ingenious arguments, two facts stand out from this record. The price defendant asked did approach fair market value, since the Usmans paid it and Phan would have paid it and more. And plaintiff ultimately did not close escrow because of anything defendant said or did, but because he could not obtain the necessary financing. For all the foregoing reasons plaintiff's motion is **DENIED,** defendant motion is **GRANTED** and judgment will be entered in defendant's favor on the complaint.

---

20. Specific performance is a form of contractual relief, not an independent claim. *See* 5 Witkin, *California Procedure,* Pleading § 740 (4th ed.1997). It is unwarranted here because the Usmans have already purchased the Station, and plaintiff has not demonstrated that they were not bona fide purchasers. *See Rogers v. Davis,* 28 Cal.App.4th 1215, 1222, 34 Cal.Rptr.2d 716 (1994). Plaintiff has also failed to establish that he is ready, willing, and able to perform under the Sales Contract. *See Gaggero v. Yura,* 108 Cal.App.4th 884, 890, 134 Cal.Rptr.2d 313 (2003).

21. Other adequate remedies would have also been available for defendant's past conduct had plaintiff prevailed, making declaratory relief inappropriate. *See* William Schwarzer et al., *Federal Civil Procedure Before Trial,* ¶ 10:13.5 (2005).