**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

BP WEST COAST PRODUCTS LLC, a
Delaware limited liability
company,
            *Plaintiff-Appellee,*

            v.

RAYMOND D. MAY; SHARANJEET K.
GHUMMAN,

            *Defendants-Appellants,*

            and

NANDI, INC.; WEST JET, INC.,
                        *Defendants.*

No. 05-15076

D.C. No.
CV-02-00529-LRH

OPINION

Appeal from the United States District Court
for the District of Nevada (Reno)
Larry R. Hicks, District Judge, Presiding

Argued and Submitted
December 8, 2005—Pasadena, California

Filed May 1, 2006

Before: Harry Pregerson, Robert E. Cowen,* and
Sidney R. Thomas, Circuit Judges.

Opinion by Judge Cowen

---

*The Honorable Robert E. Cowen, Senior United States Circuit Judge
for the Third Circuit, sitting by designation.

4953

## COUNSEL

Gennady L. Lebedev, Esq., Los Angeles, California, for the appellants.

Jeffrey M. Hamerling, Esq., San Francisco, California, for the appellee.

## OPINION

COWEN, Circuit Judge:

Raymond May and Sharanjeet Ghumman appeal the order of the district court granting summary judgment in favor of BP West Coast Products LLC ("BPWCP"). The district court concluded that BPWCP did not violate the Petroleum Marketing Practices Act ("PMPA") when it sold its interests in the gas facilities operated by May and Ghumman and non-renewed its franchise relationships with May and Ghumman. The principal issue on this appeal is whether BPWCP acted in good faith and in the normal course of business when it determined to sell the facilities in compliance with the PMPA.

We have jurisdiction pursuant to 28 U.S.C. § 1291 and will affirm.

## I.

BPWCP owns the real property and improvements of several ARCO-branded gasoline facilities in the western United States. BPWCP leased some of the facilities to franchisees as lessee dealers. May and Ghumman were lessee dealers who operated gas stations and am/pm Mini Markets pursuant to written franchise agreements with BPWCP.

As lessee operators, they were required to pay monthly rent and royalties on fuel sales. They could not discontinue the ARCO brand at their facilities and had to renew their respective agreements with BPWCP every three years, or risk being discontinued.

Every year BPWCP's Real Estate Manager and Regional Sales Managers evaluate BPWCP's capital investments and the performance of its retail facilities in each of its markets. The managers consider various economic, financial, and competitive factors. The economic factors include sales and growth patterns, and current and future demographics in the markets. The financial factors include the present value of the future estimated income from the facilities, the size of the lots of the facilities, gasoline volume sales, sales from any am/pm Mini Markets located on the facilities, the need to make improvements or upgrades to the facilities, the ability to expand the facilities, and the rate of return on the capital investment in the facilities. The competitive factors include the presence or absence of ARCO-branded and competing stations in the vicinity of the facilities, and regulatory barriers to entry into the markets. In 2001, the managers considered the above factors and recommended to the appropriate decision makers that BPWCP sell all of its interests in the northern Nevada market, including its interests in the facilities owned

by May and Ghumman. The recommendation to sell was accepted.

The real estate department arranged for the facilities to be sold through a sealed bid process conducted by a marketing company, the National Real Estate Clearinghouse ("NRC"). The decision to solicit sealed bids in such a situation was unique for BPWCP. Historically, when BPWCP desired to sell property and maintain it as an ARCO-branded facility, it typically negotiated directly with the dealer rather than solicit bids. In this case, however, BPWCP notified May and Ghumman that it was considering recovering its capital investment in their facilities, informed them about the sealed bid process, and encouraged them to participate.

As part of the bidding process, NRC marketed the facilities, educated potential buyers about the process, and prepared written materials and due diligence packages. The bidding materials related that the properties were to be sold as operational ARCO and am/pm sites. The facilities included a mandatory fifteen-year ARCO and am/pm branded franchise agreement with BPWCP. The bidding materials also contained confidential information regarding BPWCP's franchisees' convenience store sales and gasoline volumes. The materials further informed bidders that BPWCP reserved the right to withdraw any property from the sealed bid sale at any time, without notice, in its sole discretion. BPWCP also reserved the right to overlook minor inconsistencies or nonconformance in any bid.

Under the NRC procedure, third parties prequalified before submitting their bids by attending a NRC-conducted bid seminar, and by providing information regarding their credit history and financial resources. The third parties had to make their bids on a preset purchase agreement and include a bid deposit equal to 2.5% of the sale price being offered. Successful bidders had to increase their bid deposit to 10% of the purchase price.

Through the above bidding process, an independent third party, Bechara Victor Honein, offered to purchase May's facility for $1.4 million with a one-percent premium of $14,000 for BPWCP's cost in selling the facility. In making his bid, Honein attributed $850,000 to the goodwill of the business. As to the Ghumman facility, independent third party Badru Khan submitted a bid of $890,000 with an $8,900 premium. In determining his bid, Khan included the value of the "goodwill of an already functioning business along with the existing customer base and income stream, belonging to such business at the time of [his] bid." (ER 1365, ¶ 6.) Neither BPWCP nor NRC had any reason to believe that these third party bidders would withdraw their offers or not close escrow on the facilities.

The third party bidders agreed to enter into a "contract dealer" franchise with BPWCP by signing a fifteen-year fuel supply and am/pm Mini Market agreement with BPWCP, if the deal closed. This contract dealer relationship with the third party bidders differed significantly from the expiring lessee dealer franchise relationship. A contract dealer does not pay rent, pays a lower royalty, and is not limited to the ARCO brand after the initial franchise expires. A contract dealer also must purchase additional equipment and materials, as well as obtain all necessary licenses and permits (including a liquor license and permit to operate the facility as an ARCO-branded facility).

After the bidding had concluded, BPWCP notified May and Ghumman of its decisions to sell their facilities and nonrenew their franchises. The notices cited to PMPA section 2802(b)(3)(D) and explained that BPWCP "ha[d] made a determination in good faith and in the normal course of business to sell the premises upon which [their facilities were] located." (ER 244.) BPWCP further informed May and Ghumman that it would either make them a bona fide offer to purchase their facilities or offer them a right of first refusal

("ROFR") if BPWCP obtained an offer from a third party to purchase their facilities.

On August 8, 2002, BPWCP offered May a ROFR to purchase its interests in his facility for the same $1.4 million purchase price offered by Honein. BPWCP also offered Ghumman a ROFR to purchase its interests in his facility for the same $890,000 offered by Khan. Unlike Honein and Khan, May and Ghumman did not have to pay any premium for buying the facilities. They were also not required to purchase fuel from BPWCP and operate an am/pm Mini Market franchise on the facilities for the next fifteen years. Instead, BPWCP offered them the choice of buying their respective facilities and either (1) entering into the same new contract dealer relationship as Honein and Khan; or (2) continuing to operate under their respective existing franchise agreements until the end of their three-year terms, at which time they could debrand and sell other gasoline, or cease selling gasoline completely.

May and Ghumman obtained appraisals of the "As Is" fair market value of the land, improvements, and BPWCP-owned equipment in their facilities. May's facility was appraised at $1,030,000, rendering BPWCP's ROFR offer 36% in excess of his appraisal. Ghumman's facility was appraised at $410,000, rendering BPWCP's ROFR offer 117% in excess of his appraisal. Both May and Ghumman accepted BPWCP's ROFR offers "under protest" with reservation of all legal rights.

BPWCP filed a complaint with the United States District Court for the District of Nevada seeking a declaratory judgment that it had fully complied with the PMPA when it nonrenewed the franchises. May and Ghumman answered the complaint and filed a counterclaim for damages, injunctive relief, and declaratory relief for violations of the PMPA. Following extensive discovery, the district court granted summary judgment to BPWCP.

## II.

"The PMPA is intended to protect gas station franchise owners from arbitrary termination or nonrenewal of their franchises with large oil corporations and gasoline distributors, and to remedy the disparity in bargaining power between parties to gasoline franchise contracts." *DuFresne's Auto Serv., Inc. v. Shell Oil Co.*, 992 F.2d 920, 925 (9th Cir. 1993). One specific purpose of the PMPA is to protect a franchisee who has built up substantial goodwill in a station from having the franchise arbitrarily taken. *See Brach v. Amoco Oil Co.*, 677 F.2d 1213, 1220 (7th Cir. 1982) (citing statement of Rep. Mikva, 123 Cong. Rec. 10,386 (1977)). Despite the protection offered to franchisees, the PMPA was also enacted to provide " 'adequate flexibility so that franchisors may initiate changes in their marketing activities to respond to changing market conditions and consumer preferences.' " *Unocal Corp. v. Kaabipour*, 177 F.3d 755, 762 (9th Cir. 1999) (quoting S. Rep. No. 95-731, at 18-19 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 873, 877).

[1] To achieve these goals, the PMPA "establish[es] 'minimum Federal standards governing the termination and nonrenewal of franchise relationships for the sale of motor fuel by the franchisor or supplier.' " *Fresher v. Shell Oil Co.*, 846 F.2d 45, 46 (9th Cir. 1988) (per curiam) (quoting S. Rep. No. 95-731 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 873). The PMPA prohibits a service station franchisor from terminating or declining to renew an existing franchise relationship unless one of the conditions set forth in 15 U.S.C. § 2802(b) has been satisfied.[1] Pursuant to § 2802(b)(3)(D)(i)(III), a franchisor may decline to renew a franchise agreement having a term

---

[1] The franchisee bears "the burden of proving the termination of the franchise or the nonrenewal of the franchise relationship." 15 U.S.C. § 2805(c). The franchisor then bears "the burden of going forward with evidence to establish as an affirmative defense that such termination or nonrenewal was permitted under section 2802(b) or 2803." *Id.*

of three or more years and decide to sell such premises if such "determination [is] made by the franchisor in good faith and in the normal course of business." Before selling leased marketing premises, a franchisor must "either: (I) [make] a bona fide offer to sell, transfer, or assign to the franchisee such franchisor's interests in such premises; or (II) if applicable, [offer] the franchisee a right of first refusal of at least 45-days duration of an offer, made by another, to purchase such franchisor's interest in such premises." 15 U.S.C. § 2802(b)(3)(D)(iii).

**[2]** Section 2802(b)(3)(D)(i)(III)'s good faith requirement "looks to whether the franchisor's actions are designed to 'conceal selective discrimination against individual franchises.' " *Kaabipour*, 177 F.3d at 767 (citation omitted). "This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal." *Valentine v. Mobil Oil Corp.*, 789 F.2d 1388, 1392 n.7 (9th Cir. 1986) (quoting S. Rep. No. 95-731, at 37 (1978) *as reprinted in* 1978 U.S.C.C.A.N. 873, 895-96). The test for determining good faith is subjective, and the court should look to the franchisor's intent rather than the effect of the franchisor's actions. *See Svela v. Union Oil Co. of Cal.*, 807 F.2d 1494, 1501 (9th Cir. 1987). Objective evidence, such as internal company documents, may provide adequate proof of good faith. *See Valentine*, 789 F.2d at 1393 (relying on franchisor's business plans).

**[3]** A franchisor meets the "normal course of business" requirement if the determination was "the result of the franchisor's normal decision making process." *Valentine*, 789 F.2d at 1392 n.7 (quoting S. Rep. No. 95-731, at 37 (1978) *as reprinted in* 1978 U.S.C.C.A.N. 873, 895-96). "In determining whether [a franchisor] made its decision to withdraw in the normal course of business, the evidence indicative of good faith is likely to be instructive." *Beck Oil Co. v. Texaco Ref. & Mktg., Inc.*, 25 F.3d 559, 562 (7th Cir. 1994).

The inquiry of whether the franchisor made the substantive decision in good faith and in the normal course of business "tests the honest commercial judgment of the franchisor." *Sandlin v. Texaco Ref. & Mktg., Inc.*, 900 F.2d 1479, 1481 (10th Cir. 1990). "These tests provide adequate protection of franchisees from arbitrary or discriminatory termination . . . yet avoid judicial scrutiny of the business judgment itself. Thus, it is not necessary for the courts to determine whether a particular marketing strategy, such as a market withdrawal, . . . is a wise business decision." *Massey v. Exxon Corp.*, 942 F.2d 340, 345 (6th Cir. 1991) (quoting S. Rep. No. 95-731, at 37 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 873, 896); *accord Svela*, 807 F.2d at 1501 (noting that Congress did not intend for courts to intrude into the marketplace by permitting "judicial second-guessing of the economic decisions of franchisors").

**[4]** The district court ruled as a matter of law that BPWCP made the determination to sell the facilities operated by May and Ghumman in good faith and in the normal course of business. To establish its affirmative defense, BPWCP presented substantial and uncontradicted evidence that the sale process above took place because its Real Estate Manager and Regional Sales Managers recommended that it sell its facilities in the northern Nevada market based on a routine annual review that evaluated numerous economic, financial, and competitive factors. After obtaining bids on the facilities, BPWCP notified May and Ghumman of its decision to sell their facilities and nonrenew their franchises.

May and Ghumman contend that there is a genuine issue of material fact as to whether BPWCP's decision to sell their facilities was made in good faith because BPWCP's bidding structure and conduct forced third parties to include business goodwill value that belonged to May and Ghumman in their bids. In support of their argument, they note that BPWCP wanted to sell locations that could continue to be operated as ARCO gas stations by the dealers that purchased them. The

sites were to be sold as operational sites with a fifteen-year franchise agreement that was mandatory to all third party bidders. Furthermore, May and Ghumman argue that BPWCP deliberately advertised confidential convenience store sales and gasoline volumes of its franchisees for third party bidders to consider in their bid. BPWCP created an incentive for third parties to bid higher values by providing for a "break up fee" based on a percentage of the overall bid price. In addition, May and Ghumman observed that the bids on their facilities were much higher than the fair market appraised values which they obtained. Accordingly, they contend that the third party bidders considered goodwill in their bids. Finally, Khan admitted that he included the value of the goodwill in his bid on Ghumman's facility, and Honein acknowledged that he included the goodwill value in his bid on May's facility.

**[5]** Even if the bid process encouraged bidders to include goodwill value, however, the PMPA does not protect against the loss of goodwill as such. Nothing before us indicates that the decision to sell was motivated by any reasons or concerns except pure business considerations. Obtaining the value of goodwill in the sale of the facilities does not constitute evidence that BPWCP's initial determination to sell was made in bad faith; *i.e*, that the determination to sell involved selective discrimination, procedural irregularities, or was a pretext for nonrenewal. Absent some evidence of bad faith in the initial decisionmaking to sell the facilities, we are precluded from second-guessing BPWCP's economic determination to withdraw from the market in northern Nevada and sell these facilities. *See Svela*, 807 F.2d at 1501.

**[6]** May and Ghumman also claim that BPWCP did not decide to sell the facilities in the normal course of business because historically BPWCP would negotiate directly with the dealer rather than solicit bids if it wanted to sell a property and keep it as an ARCO-branded facility. While the record reflects that BPWCP's bidding process was novel, the decision to set up the bidding process occurred as a result of the

yearly evaluation performed by BPWCP's Real Estate Manager and Regional Sales Managers. Because the decision to set up the bidding process occurred during BPWCP's normal decision making process, May and Ghumman have failed to establish a genuine issue of material fact as to the normal course of business requirement.

[7] Finally, May and Ghumman also assert that BPWCP accepted a bid from Khan on the Ghumman facility even though he was not a "ready, willing, and able buyer." They contend that Khan was not a "ready, willing, and able buyer" because he had not obtained a loan prior to BPWCP's conditional acceptance of his bid. The bidding procedure required third party bidders to make their bids on a preset purchase agreement and include a bid deposit equal to 2.5% of the sale price being offered. Successful bidders had to increase their bid deposit shortly thereafter to 10% of the purchase price. We are satisfied that this procedure is sufficient to produce a ready, willing, and able buyer.

## III.

For the reasons set forth above, we find no error in the order of the district court granting summary judgment to BPWCP.

AFFIRMED.