**Usha ANAND, an individual, Plaintiff,**

v.

**BP WEST COAST PRODUCTS LLC, a Delaware limited liability company, and Does 1 through 25, inclusive Defendants.**

**No. CV 06–1896 MMM (EX).**

United States District Court,
C.D. California.

April 12, 2007.

---

**6.** January 13, 2007, the 185th day, was a Saturday, and January 15, 2007, was a court holiday. Fed.R.Civ.P. 6(a).

James N. Kahn, Thomas P. Bleau, Bleau Fox and Fong, Los Angeles, CA, for Plaintiff.

John D. Arya, Deborah Y. Jones, Kurt Osenbaugh, Sayaka Karitani, Weston Benshoof Rochefort Rubalcava & MacCuish, Los Angeles, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MORROW, District Judge.

On March 29, 2006, plaintiff Usha Anand filed this action against defendant BP West Coast Products LLC ("BP") and certain fictitious defendants. Plaintiff was formerly a party to an ARCO service station franchise agreement with defendant. She alleges that defendant violated the Petroleum Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801–2806, by failing to renew the agreement in bad faith and outside of the normal course of business, and by subsequently selling the service station to her at a price above its fair market value. She seeks compensatory damages, punitive damages, attorney's fees and costs, as well as declaratory relief. On March 5, 2007, defendant filed a motion for summary judgment.

### I. FACTUAL BACKGROUND

Anand is a former ARCO service station dealer, whose am/pm MINI–Market and PMPA Franchise Agreements with defendant BP expired on April 1, 2005.[1]

---

1. Statement of Uncontroverted Facts and Conclusions of Law in Support of BP West Coast Products LLC's Motion for Summary Judgment, or Alternatively, for Summary Adjudication of Plaintiff Usha Anand's First and Second Claims for Relief ("Def.'s Facts"), ¶ 1; Statement of Genuine Issues and Uncontroverted Facts in Support of Plaintiff's Opposition to BP West Coast Products LLC's Motion for Summary Judgment, or Alternatively, for

Anand's service station and the land on which it was situated were owned by BP.[2] In August 2004, as part of its "L.A. Network Plan," BP decided to cease doing business at plaintiff's location and sell the property, both because there was another ARCO am/pm location nearby and because BP would have had to make a substantial investment in the station to bring it up to current BP standards.[3] As a result, on August 26, 2004, BP sent a notice of franchise non-renewal to Anand via certified mail. The notice stated that the franchise agreements would not be renewed when they expired on April 1, 2005, and that she would receive either a sales offer from BP or be given a right of first refusal regarding third-party offers for sale.[4]

BP then commissioned an independent MAI appraiser[5] to value plaintiff's station and—consistent with that appraisal—offered to sell the station to Anand for $1,131,000. BP sent Anand a standard form agreement for the sale of service stations to franchisees.[6] The sales agreement contained, *inter alia*, the following provisions: (1) a mineral reservation, under which BP retained the rights to any minerals, oil, gas, or other hydrocarbon substances below a depth of 500 feet; and (2) a waiver of claims for delay or termination, under which Anand waived any claims against BP arising from termination of the sales agreement or delay in closing escrow due to the discovery before closing of environmental contamination on the property.[7] The agreement also obligated Anand to execute and deposit into escrow a "Declaration of Environmental Restriction and Other Environmental Covenant and Condition,"[8] under which, *inter alia*, she (1) waived all claims against BP arising from the presence of any environmentally hazardous materials on the property; (2) agreed, for a period of twenty-five years, not to excavate any soil at a depth

---

Summary Adjudication of Plaintiff Usha Anand's First and Second Claims for Relief ("Pl.'s Facts"), ¶ 1.

2. Def.'s Facts, ¶ 1; Pl.'s Facts, ¶ 1.

3. Def.'s Facts, ¶ 2; Pl.'s Facts, ¶ 2.

4. Def.'s Facts, ¶ 3; Pl.'s Facts, ¶ 3.

5. "Real estate appraisers, like professionals in some other industries, may earn from private associations 'unofficial' designations and certifications which serve as extra indicators of their prowess. An appraiser need not earn any of these designations to work in this field, but many appraisers find them useful for attracting business and some appraisers earn more than one." *Appraisers Coalition v. Appraisal Institute*, No. 93 C 913, 1999 WL 89663, *1 (N.D.Ill. Feb. 12, 1999). The MAI designation is offered by the Appraisal Institute, which was formed in 1991 through the merger of what were then "two of the best known" organizations that grant appraisal designations, the Society of Real Estate Appraisers and the American Institute of Real Estate Appraisers. *Id.* The MAI designation is "held by appraisers who are experienced in the valuation and evaluation of commercial, industrial, residential and other types of properties, and who advise clients on real estate investment decisions." See Appraisal Institute, About Us: Designation, at http://www.appraisalinstitute.org/about/designations.asp (last visited Mar. 24, 2007).

6. Def.'s Facts, ¶ 4 (citing, *inter alia*, Declaration of Jeff Cary in Support of BP West Coast Products LLC's Motion for Summary Judgment, or Alternatively, Motion for Summary Adjudication ("Cary Decl."), Exhibit B: Limited Appraisal/Summary Report prepared by Herron Companies for Bradley A. Lindskog, Real Estate Manager, BP Arco West Coast Business Unit ("Key Appraisal")); Pl.'s Facts, ¶ 4. In fact, the appraiser valued the station property, improvements, and equipment at $1,175,000; this figure included $44,000 for certain equipment that was not being sold, however. (Def.'s Facts, ¶ 4; Pl.'s Facts, ¶ 4.)

7. Cary Decl., Exhibit D: Agreement for PMPA Sale of Real Estate to Nonrenewed Lessee Dealer Accepting BP's Bona Fide Offer To Sale ("Sales Agreement"), §§ 4, 12.9

8. *Id.*, §§ 7.2(a), 12.4

greater than four feet in certain designated "Restricted Areas" on the property, i.e., locations where underground petroleum storage tanks were located or had previously been located, and where the station's above-ground "dispenser island" was located; and (3) agreed not to install any new underground petroleum storage tanks in the "Restricted Areas," other than replacements for the existing underground storage tanks.[9]

9. Id., §§ 3, 6.2–.5.

10. Def.'s Facts, ¶ 5. Plaintiff has asserted evidentiary objections to paragraph five of defendant's statement of uncontroverted facts. Her objections (which the court overrules *infra*) are not directed to this fact, however. In addition, the deposition testimony of plaintiff's husband, Narinder Anand, which defendant has submitted in support of its motion for summary judgment, supports a finding that this fact is uncontroverted. (Declaration of Kurt Osenbaugh in Support of BP West Coast Products LLC's Motion for Summary Judgment, or Alternatively, Motion for Summary Adjudication ("Osenbaugh Decl."), Exhibit E: Deposition of Narinder Anand ("Anand Depo.") at 54:22–55:25.) The court therefore considers the fact undisputed.

11. Def.'s Facts, ¶ 5 (citing Osenbauch Decl., Exhibit B: Complete Appraisal and Self-Contained Report prepared by Hopkins Appraisal Services for Trish Hullen, Citicorp Leasing, Inc., ("Hopkins Appraisal"), and Anand Depo. at 54:22–55:25). Plaintiff asserts three objections to admission of the Hopkins Appraisal: (1) that the appraisal is hearsay; (2) that it is not properly authenticated; and (3) that it is irrelevant. None of these objections has merit. First, the Hopkins Appraisal is not hearsay, because it is not being offered for the truth of the matters stated (e.g., that the actual value of Anand's station at the time of the appraisal was $1,560,000), but merely to prove that the appraisal was conducted. Second, the Hopkins Appraisal is properly authenticated, as Anand produced it to defendant during discovery. (See Osenbaugh Decl., ¶ 3.) Documents produced in response to discovery requests are admissible on a motion for summary judgment since they are self-authenticating and constitute the admissions of a party opponent. See *Architectural*

After receiving BP's offer, Anand applied for a purchase money loan from Citicorp, which commissioned its own appraiser to value the property;[10] that appraiser concluded that the raw land, real property improvements, and other equipment at the site were worth $1,560,000.[11] Thereafter, on June 3, 2005, plaintiff's husband commissioned a third appraiser to value the station; he found that the real property and attendant equipment had a value of $950,000.[12]

*Iron Workers Local No. 63 Welfare Fund v. United Contractors, Inc.,* 46 F.Supp.2d 769, 771–72 (N.D.Ill.1999); *Federal Trade Commission v. Hughes,* 710 F.Supp. 1520, 1523 (N.D.Tex.1989) (holding that documents produced in response to discovery requests were authenticated under Rule 901(b)(4) of the Federal Rules of Evidence and constituted party admissions under Rule 801(d)(2)(A)). Moreover, Anand's husband subsequently authenticated the Hopkins appraisal at his deposition. (See Anand Depo. at 54:22–55:25.) Finally, the Hopkins Appraisal is not irrelevant, as it establishes (along with the other appraisals commissioned by the parties) the range of values given Anand's station before its sale. This is probative in assessing whether defendant's offering price approached the fair market value of the station. The appraisal is also not "expert testimony," as Anand suggests in her opposition. (See Plaintiff Usha Anand's Memorandum of Points and Authorities in Opposition to BP West Coast Products LLC's Motion for Summary Judgment, or Alternatively, for Summary Adjudication of Plaintiff Usha Anand's First and Second Claims for Relief ("Pl.'s Opp.") at 5.) Rather, it is documentary evidence that need not meet the evidentiary standards for expert testimony.

12. Def.'s Facts, ¶ 6; Pl.'s Facts, ¶ 6. In her report, this appraiser stated that the appraisal was "intended ... to assist [Narinder Anand] and his attorney in their negotiations with [BP]" of the offering price for the station (see Osenbaugh Decl., Exhibit A: Summary Appraisal Report prepared by Eve D. Williams, MAI for Nick Anand ("Williams Appraisal") at 1). Anand's husband insists, however, that he commissioned the is third appraisal "to determine whether [BP's] offered purchase price was fair" (see Declaration of Narinder

## II. DISCUSSION

### A. Standard Governing Motions For Summary Judgment

A motion for summary judgment must be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.PROC. 56(c). A party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying those portions of the pleadings and discovery responses that demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party. On an issue as to which the nonmoving party will have the burden of proof, however, the movant can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case. See *id.* If the moving party meets its initial burden, the nonmoving party must set forth, by affidavit or as otherwise provided in Rule 56, "specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

In judging evidence at the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. Rather, it draws all inferences in the light most favorable to the nonmoving party. See *T.W. Electrical Service, Inc. v. Pacific Electrical Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The evidence presented by the parties must be admissible. FED.R.CIV.PROC. 56(e). In addition, conclusory, speculative testimony in affidavits and moving papers is insufficient to raise genuine issues of fact and defeat summary judgment. See *Thornhill Pub. Co., Inc. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir.1979); see also *Falls Riverway Realty, Inc. v. Niagara Falls*, 754 F.2d 49, 56 (2d Cir.1985).

### B. Application Of The PMPA

■ "Recognizing the vast disparity in bargaining power between franchisors and franchisees in the petroleum industry, Congress enacted the PMPA in an attempt to level the playing field on which these parties interact." *Beachler v. Amoco Oil Co.*, 112 F.3d 902, 904 (7th Cir.1997). As the Ninth Circuit has observed, "[t]he overriding purpose of Title I of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship." *Ellis v. Mobil Oil*, 969 F.2d 784, 788 (9th Cir.1992); see also *Patel v. Sun Co., Inc.*, 141 F.3d 447, 459 (3d Cir. 1998) ("The PMPA's goal is to protect a franchisee's 'reasonable expectation' of continuing the franchise relationship while at the same time insuring that distributors have 'adequate flexibility . . . to respond to changing market conditions and consumer preferences,'" quoting *Slatky v. Amoco Oil Co.*, 830 F.2d 476, 478 (3d Cir.1987) (en banc), and S. REP. No. 95–731, at 18–19 (1978), reprinted in 1978 U.S.C.C.A.N. 873, 877). To this end, the Act provides franchisees with certain protections against arbitrary termination or non-renewal. See

---

Anand in Support of Plaintiff's Opposition to BP West Coast Products LLC's Motion for Summary Judgment, or Alternatively, Motion for Summary Adjudication of Plaintiff Usha Anand's First and Second Claims for Relief,

¶ 4). The reason Anand and her husband commissioned the Williams Appraisal is immaterial to resolution of defendant's motion for summary judgment.

*Darling v. Mobil Oil Corp.,* 864 F.2d 981, 983 (2d Cir.1989) (the "overriding purpose" of the PMPA is to provide "protection for franchisees from arbitrary and discriminatory terminations or nonrenewals," quoting S. REP. No. 95–731 at 15, reprinted in 1978 U.S.C.C.A.N. at 874); *Harris v. Equilon Enterprises, LLC,* 107 F.Supp.2d 921, 924 (S.D.Ohio 2000) ("Congress enacted the PMPA in 1978 to protect franchisees from arbitrary or discriminatory termination or nonrenewal of their franchises"). One such protection is the requirement that any franchisor that decides to terminate or non-renew for a reason other than franchisee misconduct must do so "in good faith and the normal course of business." See 15 U.S.C. § 2802(b)(3)(D). A second is that a franchisor that has elected to terminate or non-renew for business reasons must make "a bona fide offer to sell, transfer or assign" its interest in the premises to the franchisee, or, where applicable, offer the franchisee a right of first refusal as to any third party offer received. *Id.* The bona fide offer provision " 'assur[es] the franchisee an opportunity to continue to earn a livelihood from the property while permitting the distributor to end the franchise relationship.' " *Sandlin v. Texaco Refining and Marketing, Inc.,* 900 F.2d 1479, 1481 (10th Cir.1990) (quoting *Slatky,* 830 F.2d at 484).

▮ The provisions of the PMPA must "be liberally construed consistent with the goal of protecting franchisees." *Ajir v. Exxon Corp.,* 855 F.Supp. 294, 297 (N.D.Cal.1994), aff'd, 185 F.3d 865, 1999 WL 393666 (9th Cir.1999) (Unpub.Disp.); accord *Unocal Corp. v. Kaabipour,* 177 F.3d 755 (9th Cir.1999); see also *Beachler,* 112 F.3d at 904 ("[A]s remedial legislation, the PMPA must be given a liberal construction consistent with its overriding purpose to protect franchisees" (internal quotations omitted)).

### 1. Whether BP's Non–Renewal Decision Was Made in Good Faith and in the Normal Course of Business

▮ "Under the PMPA, the franchisee has the initial burden of proving that his franchise was not renewed. The burden then shifts to the franchisor to demonstrate that the non-renewal was proper under the PMPA. The PMPA prohibits the termination or non-renewal of any gasoline industry franchise unless 'such termination [or non-renewal] is based upon a ground' described in the PMPA." *Reyes v. Atlantic Richfield Co.,* 12 F.3d 1464, 1469 (9th Cir. 1993) (citing 15 U.S.C. §§ 2802(b)(1)(B), 2805(c)); accord *BP West Coast Products LLC v. May,* 447 F.3d 658, 663 n. 1 (9th Cir.2006). One of the permitted grounds is that the franchisor "in good faith and in the normal course of business" decided to sell the leased marketing premises. 15 U.S.C. § 2802(b)(3)(D)(III). The "good faith requirement looks to whether the franchisor's actions are designed to conceal selective discrimination against individual franchises. This good faith test is meant to preclude sham determinations from being used as an artifice for termination or non-renewal." *BP West Coast Products LLC,* 447 F.3d at 663 (citations and internal quotations omitted). As a result, in evaluating good faith, the court does not inquire whether the franchisor's non-renewal decision was economically sound, i.e., it does not scrutinize the franchisor's business judgment itself; rather, it asks whether the franchisor's decision reflects its "honest commercial judgment." *Id.* " 'So long as the franchisor does not have a discriminatory motive or use the altered terms as a pretext to avoid renewal, the franchisor has met the burden required by the PMPA for determining good faith.' " *Valentine v. Mobil Oil Corp.,* 789 F.2d 1388, 1392 (quoting *Baldauf v. Amoco Oil Co.,* 553 F.Supp. 408, 412 (W.D.Mich.1981), aff'd, 700 F.2d 326 (6th Cir.1983)). "A

franchisor meets the 'normal course of business' requirement if the determination was the result of the franchisor['s] normal decision making process." *Harara v. ConocoPhillips Co.*, 377 F.Supp.2d 779, 785 (N.D.Cal.2005) (quoting *BP West Coast Products LLC v. Greene*, 318 F.Supp.2d 987, 996 (E.D.Cal.2004)).

■■■■ There is no dispute that BP did not renew its franchise agreement with Anand. As a result, BP bears the burden of establishing that its non-renewal was proper under the PMPA. To meet this burden, BP has adduced the declaration of Jeff Cary, BP's Regional Portfolio Manager, who was personally involved in the company's decision to divest itself of Anand's service station.[13] Cary states that the non-renewal was prompted by BP's good-faith determination that the station was a "non-strategic asset," due both to the fact that it was near another ARCO am/pm location and to the substantial investment that would have been required to bring the station into compliance with current BP standards.[14] Cary asserts that the decision was made "as part of [BP's] routine business planning," and was based on a 2004 "periodic review" of the company's Los Angeles area service station network (the "L.A. Network Plan").[15] Anand has adduced no evidence controverting Cary's assertions.[16] As a result, the evidence presented establishes that BP decided not to renew the franchise in good faith and in the normal course of business, and a reasonable trier of fact could not con-

clude otherwise. The court accordingly adjudicates this issue in BP's favor. Cf. *BP West Coast Products LLC*, 447 F.3d at 663–64 (affirming summary judgment for BP on the issue of whether its decision to divest itself of service stations in northern Nevada was made in good faith and in the normal course of business because "substantial and uncontroverted evidence" established that "the sale process ... took place because [BP's] Real Estate Manager and Regional Sales Managers recommended that it sell [the] facilities ... based on a routine annual review that evaluated numerous economic, financial, and competitive factors"); *Harara*, 377 F.Supp.2d at 786 ("The evidence presented establishes that defendant decided not to renew the franchise in good faith and in the normal course of business. A reasonable trier of fact could not conclude otherwise, and Conoco is therefore entitled to judgment as a matter of law").

In opposition to defendant's motion, plaintiff argues—without citation to authority—that BP's decision *not* to sell the rights to the minerals beneath the station, as well as its inclusion of various waivers and restrictions in the Sales Agreement, raises a triable issue of fact as to whether its decision to sell the station was made in good faith and in the normal course of business.[17] The court does not agree. No reasonable trier of fact could conclude that BP's stated economic reasons for selling the station were pretextual simply because it retained the rights to the minerals be-

---

**13.** Cary Decl., ¶ 1.

**14.** *Id.*, ¶ 2.

**15.** *Id.*

**16.** Indeed, both Anand and her husband admitted at deposition that they know of no information suggesting that BP's decision to sell the franchise was made in bad faith or outside the normal course of business. (See

Osenbauch Decl., Exhibit D: Deposition of Usha Anand, at 24:13–25:7; Anand Depo. at 39:4–21.) In fact, Anand's husband conceded that the sole reason he had his wife file this action against BP was his belief that the price she paid for the station was too high, not because BP's decision to sell was improper under the PMPA. (Anand Depo. at 76:16–21.)

**17.** See Pl.'s Opp. at 3.

neath the station or because it included various waivers and restrictions in the Sales Agreement. Consequently, this argument does not alter the court's view that it is appropriate to adjudicate whether BP's non-renewal was made "in good faith and in the normal course of business" summarily. Cf. *BP West Coast Products LLC,* 447 F.3d at 664 (holding that evidence concerning the process by which BP obtained third-party bids on non-renewed franchisees' stations was not proof that "the initial determination to sell was made in bad faith; i.e., that the determination to sell involved selective discrimination, procedural irregularities, or was a pretext for nonrenewal").

### 2. Whether BP's Offer to Sell the Station Was "Bona Fide"

■■■ Whether a bona fide offer has been made "is measured by an objective market standard. To be objectively reasonable, an offer must 'approach[ ] fair market value.' " *Ellis,* 969 F.2d at 787 (quoting *Slatky,* 830 F.2d at 485); *Ajir,* 855 F.Supp. at 298 n. 5.[18] To that end, the offering price "should reflect what a willing purchaser would pay for the fee title of the land, the improvements and the equipment of a terminated franchise." *Ellis,* 969 F.2d at 788. The offering price need not be the actual fair market value of the property, however, because if courts had to "determine whether the distributor's offer *actually* was at fair market value, distributors could rarely rest comfortably that their offer would eventually be determined by the court to be fair market value." *Slatky,* 830 F.2d at 485 (emphasis added); see also *Rhodes v. Amoco Oil Co.,* 143 F.3d 1369, 1372 (10th Cir.1998) ("[T]he use of [the] term ['bona fide' offer], rather than a

mandate that the franchisor offer the property to the frachisee *at* market value, reflects a legislative judgment that the latter standard would be overly strict"); *LCA Corp. v. Shell Oil Co.,* 916 F.2d 434, 439 (8th Cir.1990) ("[T]he objective reasonableness test does not measure whether the franchisor's offer was *actually* at fair market value but rather whether the offer *approached* fair market value"). Accordingly, "[t]he fair market value of any one property is a flexible concept," *Arnold v. Amoco Oil Co.,* 872 F.Supp. 1493, 1500 (W.D.Va.1995), and a "range of prices" may have a "reasonable claim[ ] to being [i.e., approaching] fair market value." *Slatky,* 830 F.2d at 485.

■■■ Because a range of prices may reasonably be found to approach fair market value, the mere fact that the parties have submitted competing appraisals and/or offers does not necessarily preclude the entry of summary judgment in one party's favor. See, e.g., *Rhodes,* 143 F.3d at 1372 ("We wish to emphasize, however, that we do not hold that summary judgment for the franchisor can never be proper, and that jury trial must always be had, whenever the parties each produce an appraisal and the appraisals do not arrive at identical conclusions on value"); see also *Sandlin,* 900 F.2d at 1482–83 (holding that judgment as a matter of law was properly entered in a franchisor's favor despite a difference between the parties' appraisals, as the difference was relatively small and the franchisor's offer was between the two). This is because an estimation of " 'value' almost always involves a conjecture, a guess, a prediction, a prophecy." *Amerada Hess Corp. v. Comm'r,* 517 F.2d

---

**18.** Given the clarity and consistency with which this "objective reasonableness" standard has been articulated by courts within and outside the Ninth Circuit, the court cannot accept BP's repeated assertion (see Def.'s

Mem at 7, 9) that its *subjective belief* regarding the fair market value of Anad's station is relevant in determining whether its offering price was "bona fide" under the PMPA.

75, 83 (3d Cir.1975) (collecting cases). "Furthermore, in determining the fair market value of a property, no one valuation method is required." *Arnold,* 872 F.Supp. at 1500 (citing *Slatky,* 830 F.2d at 486 n. 9); see also *Ellis,* 969 F.2d at 787 n. 4 ("There are many acceptable ways to appraise property"). Instead, the facts of each individual case will determine what constitutes a bona fide offer. *Id.* at 788.

■ To evaluate whether BP's offering price approached the fair market value of Anand's station, therefore, the court must review the evidence in the record to determine, given the specific dynamics of the property market in which the station is located, what range of prices might be considered reasonably to approximate fair market value. Cf. *Rhodes,* 143 F.3d at 1374, n. 5 (noting that, on remand in *Slatky,* the district court received evidence that appraisers attempt to set a value within five percent of anticipated actual selling price; that properties are often sold at fifteen to twenty percent more than appraised value; and that two appraisers attempting to estimate the fair market value of a property should generally offer values within ten to fifteen percent of one another).

Defendant argues that its offering price of $1,131,000, which was based on the Key Appraisal, falls with the range of "a reasonable fair market value determination," given that the Williams Appraisal valued the property at $950,000, while the Hopkins Appraisal valued it $1,560,000.[19] Defendant asserts that Anand's own appraiser, Eve Williams, conceded at deposition that BP's offered price fell within the reasonable range of fair market values.[20] Anand counters that, as a matter of law, "fair grounds for litigation exist[ ] and the question [of reasonableness] must be submitted to a jury when the difference in competing [appraisal] values is in excess of ten to fifteen percent."[21] Because the Key Appraisal is nineteen percent higher than the Williams Appraisal, Anand argues that she has raised a triable issue of fact as to whether the offering price approached the fair market value of the station.[22] Anand also argues that BP's reservation of mineral rights and other waivers and restrictions in the Sales Agreement render the offer not "bona fide," as that term is used in the PMPA, "because [BP] has not transferred 100% of its interest in the premises."[23]

Having reviewed the undisputed evidence in the record, the court concludes that defendant's offering price of $1,131,000 approached the fair market value of the station. This price, which was based on the Key Appraisal, is not substantially different from the Williams Appraisal's valuation of $950,000; depending on which valuation is used as a baseline, the spread between the two appraisals ($181,000) constitutes a differential of merely sixteen[24] or nineteen[25] percent. Given the relatively insubstantial size of the differential, both Anand's and BP's expert appraisers testified that each ap-

19. *Id.* at 8–10.

20. *Id.* at 10.

21. Pl.'s Opp. at 4 (citing *Kamel v. Equilon Enterprises LLC,* No. CV 00–10433 MMM (Ex), Slip. Op. at 21–22 (Morrow, J.) (Unpub. Disp. filed Jan. 8, 2002), in turn citing *Rhodes,* 143 F.3d at 1374 n. 5).

22. *Id.* at 5.

23. *Id.* at 3.

24. The Williams Appraisal is sixteen percent less than the Key Appraisal, as indicated by the following calculation: $181,000/1,131,000 = 0.160$.

25. The Key Appraisal is nineteen percent more than the Williams Appraisal, as indicated by the following calculation: $181,000/950,000 = 0.191$.

praisal could be said to represent the fair market value of Anand's station. In her deposition, for example, Williams, Anand's appraiser, admitted that there is "[n]ot a chance, most of the time," that two competent MAI appraisers will arrive at "pretty much the same value" for a commercial property.[26] With respect to gas stations in particular, Williams testified that different estimates of the depreciation of a station's fixtures and equipment may lead to "fairly substantial" differences in two competent appraisals for even "a fairly small piece of real estate," i.e., differences of a "couple of hundred grand." [27] Defendant's expert appraiser likewise states that, "given the nature of the appraisals performed," differences "as much as 20 percent or more" could separate two competent appraisals.[28] From this testimony, the court concludes that both the Key Appraisal and the Williams Appraisal fell with the range of values that have a "reasonable claim[ ] to being [i.e., approaching] fair market value," *Slatky*, 830 F.2d at 485, and that defendant's offering price of $1,131,000 ac-

cordingly approached the fair market value of Anand's station.[29]

In opposition to defendant's motion, plaintiff argues that the PMPA obligated BP to offer to "transfer[ ] 100% of its interest in the [station] premises" before its offer could be considered "bona fide," and that the mineral reservation (as well as the waivers and restrictions in the Sales Agreement) show that BP's offer was not bona fide as a matter of law.[30] Plaintiff is incorrect. The PMPA does not require a franchisor to offer 100% of its interest in a gas station to the franchisee to make a "bona fide" offer. Instead, the law requires only that the franchisor's offer enable the franchisee "to continue operating [her] facility as a service station if [she] exercise[s][her] right to buy." *Ellis*, 969 F.2d at 787. Thus, the franchisor's offer may *not*, for example, include a restrictive covenant preventing plaintiff from operating the facility as a service station for a specified number of years, see *id.* (citing *ERA Enterprises, Inc. v. Gulf Oil Corp.*, 506 So.2d 160, 165 (La.Ct.App.

26. Osenbaugh Decl., Exhibit C: Deposition of Eve D. Williams, at 14:18–21.

27. *Id.* at 16:19–17:6. The differences in the Key Appraisal and the Williams Appraisal are, as Williams' testimony suggested, almost entirely the result of differences in the two experts' valuation of the depreciation of the building- and site-improvements at the premises. Both experts arrived at nearly equivalent valuations of the raw value of the land (Williams: $685,000; Key: $689,000) as well as the depreciated value of the station equipment (Williams: $175,000; Key: $181,000). (See Williams Appraisal at 50; Key Appraisal at 31–32.) Williams, however, depreciated the station's building- and site-improvements at a rate of 75% (i.e., Williams concluded that 3/4ths of the useful lives of both building- and site-improvements had passed), while Key depreciated the station's building improvements at 30% and the station's site improvements at 50%. (See Williams Appraisal at 46; Key Appraisal at 27, 31–32.) This resulted in vastly different valuations of the station's

combined building- and site-improvements (Key: $90,000; Williams: $261,000). (See Williams Appraisal at 48; Key Appraisal at 31–32.) Indeed, the difference in the two experts' valuations of the building- and site-improvements constitutes ninety-four percent of the total differential between the appraisals.

28. Declaration of Jeffrey M. Key, MAI in Support of BP West Coast Products LLC's Motion for Summary Judgment, or Alternatively, Motion for Summary Adjudication of Plaintiff Usha Anand's First and Second Claims for Relief, ¶ 2.

29. This conclusion is reinforced when one considers that the Hopkins Appraisal, obtained after BP made its offer of sale in connection with Anand's application for a purchase money loan, estimated the property's value at $1,560,000, some $429,000 more than the price BP offered to Anand.

30. Pl.'s Opp. at 3.

1987)), and in general must offer to convey all "pumps, dispensers, storage tanks, piping or other equipment necessary for the continued operation of a service station, see *id.*" (citing *Roberts v. Amoco Oil Co.,* 740 F.2d 602, 603 (8th Cir.1984)). The PMPA does not mandate that a franchisor's offer include rights to subterranean minerals beneath the station premises, however, and does not prevent the franchisor from inserting reasonable environmental covenants and conditions in the sales agreement, so long as the covenants and restrictions do not prevent the franchisee from continuing to operate her facility as a service station. Cf. *id.* at 787 n. 3 (noting that "[t]he environmental exception for leaking storage tanks noted by the Fourth Circuit ... and by the Eighth Circuit ... is not inconsistent with [the requirement that the franchisee must be able to continue operating the service station]"). Nothing in the record indicates that Anand has been unable to operate her station due to the mineral reservation or the waivers and restrictions in the Sales Agreement. As a result, those terms have no relevance in determining whether defendant's offer was "bona fide."

### III.  CONCLUSION

For the foregoing reasons stated, defendant's motion for summary judgment is granted. Given the court's resolution of this motion, there is no longer any live controversy between BP and Anand regarding BP's non-renewal decision and the bona fide nature of its offer to sell the station. As a result, the court dismisses BP's counterclaim for declaratory relief as moot. Defendant seeks an award of attorneys' fees pursuant to 15 U.S.C. § 2805(d)(3), which authorizes the court, in its discretion, to award attorney's fees if it deems plaintiff's action frivolous. The court declines to find that the action was frivolous and therefore denies defendant's request for an award of fees.